**DAVIS CO. v. BAKER–CAMMACK HOSIERY MILLS, Inc.**

**DAVIS CO. v. BAKER–MEBANE HOSIERY MILLS, Inc.**

Civ. Nos. 342, 401.

United States District Court
M. D. North Carolina.

Aug. 12, 1949.

James P. Burns, Washington, D. C., Charles A. Noone, Chattanooga, Tenn., Robert E. Burns, New York City, Welch Jordan, Greensboro, N. C., for plaintiff.

Brooks, McLendon, Brim and Holderness, Greensboro, N. C., Paul and Paul, Philadelphia, Pa., for defendant.

HAYES, District Judge.

The above styled cases were consolidated because the patents in suit are common to both. The plaintiff alleges infringement against the defendant of certain patents owned by the plaintiff, to-wit:

1. Davis No. 2,306,246

Claim 14 alleged to be infringed by Baker-Mebane only.

2. Gastrich No. 2,067,486

Claims 1 and 4 alleged to be infringed by both defendants.

3. Getaz No. 2,054,217

Claims 10, 12 and 14 alleged to be infringed by both defendants.

4. Getaz No. 2,230,402

Claims 2 and 4 alleged to be infringed by Baker-Mebane, and Claim 4 by Baker-Cammack.

5. Getaz No. 2,230,403

Claims 1 and 7 are alleged to be infringed by both defendants.

6. Getaz No. 2,344,350

Claims 1 to 6 alleged to be infringed by Baker-Cammack; Claims 1 to 7 by Baker-Mebane.

The defenses asserted are:

A. Non-infringement of the claims of all of the patents.

B. Invalidity of all claims in suit:

1. By reason of their lack of definiteness.

2. By reason of the disclosures of prior art patents, both foreign and domestic, catalogues and other publications.

3. By reason of certain prior uses, prior sales, and prior inventions.

4. By reason of double patenting.

C. Laches, acquiescence and estoppel.

D. Implied license from predecessors in title of the plaintiff.

E. Conspiracy between the plaintiff and its predecessors in title which constitutes a violation of the anti-trust statutes of the United States; and

F. Abuse of the patent monopoly.

The cost of the defense is being paid from the funds collected by the Hosiery Investigating Committee contributed by 172 hosiery mills. The plaintiff is a Maryland corporation with offices in Chattanooga, Tenn. The two defendants are North Carolina corporations both located in the Middle District of North Carolina with their principal offices in Burlington, N. C. and Mr. J. E. Baker is President of both corporations.

This litigation concerns patents in the knitting of seamless hosiery which formerly involved three distinct and independent operations. The top of the hose was conventionally produced in the form of rib fabric on a separate machine for that purpose. The leg and foot of the stocking were produced of plain knit fabric formed on a so-called plain knitting machine having a single set of needles known as Cylinder needles. The rib fabric tops produced on the rib machine were transferred by hand to the plain knitting machine. This required the use of a so-called transfer ring on which each succeeding rib top is placed by hand, loop by loop on the pointed quills of the transfer ring. The ring carrying the rib top is then placed on the plain knitting machine with each quill point in the ring fitted over a cylinder needle and the rib top is then moved down by hand from the ring on to the needles so that they will knit the plain knit leg and foot on to the rib top. This was the conventional method at the time of the inventions involved in this suit and the cost per dozen pairs of hose produced by this cumbersome method was 20¢ per dozen pairs more than the cost embodying the inventions of the patents in suit.

[1] Various attempts were made to improve this method of production as well as to devise some ways or means by which hosiery could be produced that would have the appearance of true one by one rib top and be self-supporting and with an anti-ravel edge or selvage. Attempts were made to produce a single machine capable of performing the rib top affecting its automatic transfer and continuing the knitting of the plain knit leg and foot, but this turned out to be very expensive and commercially unsuccessful. Attempts were made to produce a complete stocking on the somewhat simple plain knitting machine having a single set of cylinder needles but none of them were successful or solved the problem until Davis through his invention embodied in patent No. 2,306,246 discovered a commercially successful automatic top stocking possessing self-supporting characteristics that has not only made it competitive with the transferred rib top stocking but which has caused the automatic self-supporting top stocking to substantially displace the transferred rib top stocking in the commercial field. Davis achieved this result through a successful incorporation of an elastic strand into a plain fabric forming the top of the stocking in such manner as to draw in the plain fabric so as to have the normal width of true rib fabric and expansibility equal to or greater than that of true rib fabric and a self-supporting characteristic far beyond that possessed by true rib fabric. To the automatic top stocking of the Davis patent 2,306,246 Getaz invented the anti-ravel, a remarkably successful anti-ravel selvage for the stocking top which obviated the necessity for a separate hemming operation as disclosed in his patent 2,344,-350. One method of forming the selvage edge is the subject matter of Getaz patent 2,054,217. Since the public demand required a stocking having the true one-by-one rib appearance Getaz produced an automatic elastic top stocking which was indistinguishable from a true one-by-one rib fabric and is embodied in his patent 2,230,402 and the corresponding method patent 2,230,403.

Full fashioned hosiery is produced on flat bed knitting machines as distinguished from circular knitting machines and it was with the full fashioned hosiery that Gastrich was primarily concerned. He was endeavoring to avoid contraction rather than induce it and in Claims 1 and 4 of his patent No. 2,067,486 he discloses one form of elastic carrying selvage edge but quite different from that contributed by Getaz.

The Baker-Mebane Co. produced Exhibit S-4 on its standard machines, Exhibit S-3 on its Banner 8 step machines and S-2 on Banner 19 step machines. Exhibit S-4 responds to Claim 14 of the Davis patent 2,306,246. It is "an article of hosiery" with "a leg portion comprising a body having a top, said top being plain knit of inelastic fabric and having an elastic thread locked to spaced wales (every other wale) in each of a plurality of spaced courses (every other course), the normal length of elastic thread floated between said spaced wales being less than the normal length of the corresponding portion of the fabric to draw in the inelastic fabric both at and between elastic carrying courses."

S-4 responds to all of the claims of the Getaz anti-ravel selvage edge patent 2,344,-350 and disclosed in claims 1 to 7. The stocking S-4 responds to each and every requirement of each of the 7 claims.

The stocking also embodies the features set forth in claims 2 and 4 of the Getaz patent 2,230,402 which calls for "A weft knit stocking having a top and leg of plain fabric, the wales of the leg being a continuation of the wales of the top, elastic yarn under high tension present in a plurality of courses in the top, said elastic yarn being tied in in alternate wales and free of intervening wales, said elastic yarn thereby causing said separated intervening wales to come together, bury the alternate wales and form a flat front on the fabric similar to a one by one rib fabric."

The method as defined in Claim 1 and 7 of the Getaz patent 2,230,403 was performed in the production of the stocking S-4 and this is also true of the method Claims 10, 12 and 14 of Getaz patent 2,054,-217. S-4 also infringes Claim 1 and 4 of the Gastrich patent 2,067,486. Exhibit S-3 produced on the Banner 8 step machine infringes the four Getaz patents in suit as to all claims in suit with exception of Claim

2 of Getaz patent 2,230,402 and Claim 7 of patent 2,344,350.

The anti-ravel selvage edge of the stocking S-3 is precisely the same in structure and produced in precisely the same manner as the anti-ravel selvage edge of the stocking S-4 and hence infringes all of the claims of the patents in the same manner as heretofore recited in respect of S-4.

The stocking S-2 is undoubtedly the same as stocking S-3 and constitutes an infringement of the claims in suit for the same reasons assigned as to stocking S-3.

The Baker-Cammack Hosiery Mills manufactured plaintiff's Exhibit S-1 which differs from S-2 and S-3 in two particulars. (a) the selvage edge of the stocking S-1 is comprised of multiple strands of elastic thread as distinguished from a single strand of elastic thread selvage edge of each of the stockings S-2 and S-3. And (b) S-1 embraces several courses of ornamental tuck stitches immediately below the anti-ravel selvage edge and infringes Claim 4 of Getaz patent 2,230,402 and the method Claims 10, 12 and 14 of Getaz patent 2,054,217 and Claims 1 and 7 of patent 2,230,403.

It is well to bear in mind that the consuming public seems to have been wedded to the idea of a rib topped hose. All of those experimenting with the solution of the problem were striving for a solution resulting in a rib top or a simulated rib top hose. Many fruitless efforts had been put forth to secure a hose with a self-supporting top and these experiments had been taking place for many years prior to the Davis invention. In 1930 the U. S. Rubber Co. brought on the market a covered rubber yarn known by the trade name "Lastex". It was employed with some measure of success when knitted as a yarn and constituting the body fabric in such things as girdles, surgical stockings and the like. Davis endeavored to use it but failed because it had an insufficient elasticity which prevented it from being pulled over the heel of the wearer. In 1934 Davis devoted his attention to the production of an automatic self-supporting stocking top through the medium of incorporating uncovered cut rubber as a spiral strand supplemental to but incorporated in the base plain knit fabric of the stocking. The removal of the elastic thread would still leave the fabric intact. The Davis contribution embraced the novel teaching of incorporating an elastic strand in a plain knit base fabric, so as to yield a fabric having the elasticity of true rib fabric, the general appearance of true rib fabric, and the capacity to render the stocking self-supporting on the wearer's leg. This feature is embodied in his application to the Patent Office Dec. 31, 1934, Serial No. 759,931. It is significant that "Lastex" had a stretch of only 100% whereas uncut rubber has about 600% stretch. After Davis succeeded in his invention the stretch of "Lastex" was increased to approximately 300% and over but the long-stretched "Lastex" and yarn developed subsequent to the invention of Davis and largely as a result thereof and since that time has been used extensively because covered yarn has its advantages over uncovered cut rubber. Davis supplemented his first filed patent application by filing on June 26, 1935 a continuation-in-part thereof which became Patent No. 2,306,246 in suit No. 401.

Now against the contention of the defendant that the Davis patents are invalid is the fact that John Wycoff Mettler, President of the Interwoven Stocking Company, the largest hosiery manufacturing company in the world became interested in Davis' invention and in January 1935 took steps to obtain an exclusive license for men's half hose under the Davis invention because he recognized it as the first successful contribution in the field of self-supporting socks. He had been in the hosiery business since 1903 and his company keeps and maintains a museum of hosiery produced in all parts of the world for many years. His position as President of the company and his long term in office would indicate that he is a man of great ability in hosiery manufacturing and as recognized by the members of the Hosiery Manufacturers Association electing him President three times indicating their respect for him. On the witness stand he appeared to be a witness pos-

sessing great knowledge in his field and there is every indication that he is a man worthy of belief. He thought enough of the Davis invention to enter into an agreement to pay a royalty of 4¢ per dozen pair for the exclusive license of men's half hose this leaving Davis the right to use children's and Misses' patent rights. By Dec. 1, 1948 his company alone had paid royalties to W. B. Davis and Son in the sum of $202,068.00 and since the transfer of the patent rights to the present plaintiff the Interwoven on the basis of 2¢ per dozen has paid the plaintiff $45,489.00. Nor should it be forgotten that the use of rubber in the manufacture of hose was prohibited during the critical war period. It is hard to conceive how a man of the experience, ability and business judgment of Mettler would have paid out such enormous royalties for the patent rights of Davis if there was no novelty in his invention as contended by defendants. There was another witness whose testimony greatly influenced this court in its decision and that was the witness Lawson whose education was directed to training in this field and whose entire life has been devoted to the textile machinery and textile operations. He, himself, is the patentee in an unusual large number of patents. His ability and familiarity with the problems involved placed him in a position separate and apart from all of the other witnesses. Mr. Davis also has spent his life in the hosiery business and he was a man whose knowledge and integrity were worthy of belief. The evidence convinced this court that the Davis patent did possess novelty and that his invention made this type of hosiery a commercial success. Davis was compelled to wage a struggle for seven years before he could obtain his patent due to a deluge of interference in the Patent Office but he succeeded ultimately as determined by the court of Customs and Patent Appeals in a decision reported in Lawson v. Davis, 129 F.2d 873, 29 C.C.P.A., Patents, 1217.

Getaz, after seeing the Davis sock in the New York office of the Iselin-Jefferson Co. recognized that Davis had an auto-matic elastic top self-supporting sock that could be produced on a plain circular knitting machine having a single set of cylinder needles and his inventions have to do with improvements on the Davis sock: (1) The Davis sock required a seperate hemming operation for the beginning edge of the sock top which Getaz overcame by a selvage or anti-ravel edge produced directly on the knitting machine. (2) Getaz realizing that the public had been used to buying true one-by-one rib top hosiery felt that it would be desirable if the automatic elastic top hose could be produced with an external appearance indistinguishable from true one-by-one rib stocking tops. The first Getaz application Serial No. 53824 was filed on December 10, 1935 and issued as patent 2,230,402 and on January 14, 1936 a second and divisional application, Serial No. 59125 was filed which eventuated in patent No. 2,054,217. A second divisional application Serial No. 153,329 was filed July 13, 1937 and eventuated in patent No. 2,230,403. A further continuation of application 53,824, application Serial No. 201861 was filed April 14, 1938 and eventuated in patent 2,344,350. The four patents all grow out of application Serial 53824 because he contributed four distinct and separable inventions: (1) The one-by-one rib fabric of automatic elastic top stocking, the subject matter of patent 2,230,402; (2) a specific form of selvage or anti-ravel edge for the automatic top stocking, subject matter of patent 2,344,350; (3) The method which produces the one-by-one rib fabric of the automatic elastic top stocking, the subject matter of patent 2,230,403; and (4) one method of producing a selvage or anti-ravel edge on a cylindrical knitting machine having a single set of needles, the subject matter of patent 2,054,217. When Mettler learned of the Getaz inventions he negotiated for the exclusive rights under them in the field of half hose and an agreement was reached between Getaz and Interwoven on April 29, 1936.

The Gastrich Patent 2,067,486 is generic to and comprehensive of the anti-ravel selvage edge of the Getaz patent

2,344,350 and infringement of that patent also constitutes infringement of the broader claims of the Gastrich patent.

Interwoven expended approximately $650,000 developing the Davis and Getaz patents and building machines to practice the inventions. The evidence discloses these huge outlays by Interwoven for royalties and the payment of royalties to Davis by Adams-Millis (one of the largest hosiery mills and a contributor to this defense) and by the named defendants here, to Elastic, but the payment of these royalties were stopped because the other mills were not paying royalties and thereupon the mills here involved proceeded in the manufacture of hosiery in utter defiance of patents and patent rights.

Mr. Baker was President of the Hosiery Investigating Committee and the committee employed counsel who advised it in accordance with the defenses pleaded here. As heretofore outlined, the defenses embrace all to be found in patent law. It is impossible to deal in detail with each defense.

■ The defense of lack of definiteness is answered in Reynolds v. Whitin Machine Works, 4 Cir., 167 F.2d 78.

The defense based on prior art patents, catalogues and publications totaled twenty-two alleged anticipating items. The comment on a like defense in Reynolds v. Whitin Machine Works, supra, is appropriate here. The Sturgess and Lawson patents are the strongest points in favor of the defendants, yet both were before the Customs and Patent Court of Appeals and priority was awarded to Davis. Lawson v. Davis, 129 F.2d 873, 29 C.C.P.A., Patents, 1217. The Sturgess patent the date of 1886. If it taught the Davis or Getaz patents which have established outstanding commercial success, it is strange that it was not so used throughout a half century. The Cartledge Patent No. 616,524 was before the Patent Office in the prosecution of Davis patent No. 2,306,246 and the claims of Davis were allowed over this reference. It was not considered pertinent to Getaz inventions and not cited. Teufel British Patent No. 9,627 and Teufel German Patent No. 163,343, dated 1902. These patents do not teach as much as Sturgess except how to make surgical fabric on a V bed machine. The Patent Office had before it the British Teufel Patent when it granted Getaz Nos. 2,230,402 and 2,230,403. The claims of Getaz Patent No. 2,230,402 and Davis patent No. 2,306,246 were allowed by the Patent Office over Steber, patent No. 810,578. The claims of the patents in suit were allowed over the series of Scott patents Nos. 1,148,056, 1,152,850 and 1,317,897. Pidgeon patent No. 1,774,-613 for an elastic corset makes no disclosure for making hosiery of the type involved under plaintiff's patents. Adams on French Patent No. 721,480 has a corresponding United States patent which was cited in the Patent Office against Davis Patent No. 2,306,246, and priority was awarded to Davis. The Gastrich patent in suit was allowed over German Patent 542,543. Coleman patent No. 2,062,208 relates to the laying in of rubber into a ribbed fabric which method is incapable of application to a plain knitting machine having a single set of cylinder needles and is not relevant to the inventions of the patents in suit. Gastrich patent No. 2,-067,486 was before the Patent Office in the prosecution of Getaz Patent No. 2,-344,350 and the claims were allowed over Gastrich. Nor is patent No. 2,131,231 the outgrowth of Richmond Hosiery Mills alleged prior use. It falls far short of teaching the inventions of the patents in suit. Moreover, the experiment at Richmond Hosiery Mills occurred as a result of knowledge of Davis' prior inventions. Davis Patent 2,306,246, in suit, is cited only as to Getaz patents in suit. It was involved in interference in the Patent Office and Getaz patent No. 2,230,402 allowed over Davis. Green Patent No. 2,347,775 was involved in interference No. 76,991 and priority was awarded over it to Getaz in 2,344,350.

■ The four prior uses asserted by the defense are: (1) Richmond Hosiery Mills. It is manifest that the experiments made here were with a Davis sock in its pos-

session. The proof here of prior use is indefinite and very unsatisfactory. Brown v. Zaubitz, C.C., 105 F. 242; National Hollow Brake Beam Co. v. Interchangeable Brake Beam Co., 8 Cir., 106 F. 693. (2) Triangle Hosiery Mills. What is said above in respect of Richmond Hosiery Mills is equally true as to prior use of Triangle Hosiery Mills. (3) Horn surgical stocking is a one by one true rib fabric formed on a knitting machine having both dial and cylinder needles. In rib fabric there is no need for an anti-ravel selvage edge. A rib knitting machine can not be started up on bare needles. Horn was not faced with a problem of forming an anti-ravel selvage edge in plain knit fabric. His work was in a different field which did not teach a solution of the problems solved by the inventions of the patent in suit. (4) The Maryville, Tennessee prior use, pleaded only as to the Getaz 2,344,350 is unavailing because the patent takes the date of December 10, 1935, the original filing date of the application as a continuation in part of that application as to all subject matter commonly disclosed by the first and subsequent application. Novadel Process Corp. v. Meyer and Co., 2 Cir., 35 F.2d 697; Tinkin Detroit Axle Co. v. Eaton Axle and Spring Co., D.C., 56 F.2d 651. The claims of Getaz Patent 2,344,350 find full response in the teaching of the December 10, 1935 application.

■■ The defense based on laches and estoppel is not supported by the proof. Getaz patents 2,230,402 and 2,230,403, and 2,344,350 and Davis patent No. 2,306,246 issued within six years from the institution of these civil actions. Hartford Empire Co. v. Swindell Bros., Inc., 4 Cir., 96 F. 2,227,233. The delay in filing suit as to Getaz patent 2,054,217 and Gastrich No. 2,067,486 has not operated to the injury of the defendants. They have known all of the time of these patents, the likelihood of suit for infringement and no injury to them has been sustained. Hartford Empire Co. v. Swindell Bros., Inc., supra. The evidence fails to establish any conduct on the part of plaintiff or its predecessors in title which rises to the dignity of an estoppel. The use of rubber in hosiery was prohibited during the critical war period and the time which elapsed between then and the commencement of these actions is not sufficient to sustain a plea of laches.

■ The defense of implied license is also untenable. The infringement by defendants occurred on Hemphill machines known as "Banner" and "Standard", not on Scott and Williams Company machines. It may be necessary in assessing damages to re-examine the evidence in detail to see if defendants in their large production utilized without alteration any machine or equipment furnished by Scott and Williams Company under an implied license to make infringing stockings, but the evidence clearly discloses widespread use of other machinery and equipment procured from unlicensed producers. It is true that a purchaser of a patented machine has the right to use what he has bought but this does not authorize the acquisition of machines from other sources and their subsequent use without license from the patentee. Brown v. Puget Sound Reduction Co., C.C., 110 F. 383,386. Scott and Williams never had any patent rights to men's half hose and consequently could not confer an implied license to make them under the Getaz patent.

■ The defense based on Anti-Trust Violations requires more detail. The patent rights of Interwoven, W. B. Davis and Son and Scott and Williams Co. were conveyed to the Davis Company, covering 15 patents 6 of which are here involved. All of these patents were inter-related, all concerned the production of automatic top hosiery of the character produced on a circular knitting machine by plain knitting with a single set of cylinder needles. The organizers of the pool openly and frankly discussed with the members of the industry, making full disclosures to the industry. Their motive was not to monopolize but to free the industry from the threat of infringement suits or the payment of unreasonable royalties. The amount expended by Interwoven alone for half hose under Davis and Getaz patents is a staggering

sum. It was Mettler who proposed the idea but with no thought on his part of taking advantage of other hosiery manufacturers. His public statements before the pool show that he was animated with a desire to serve the entire industry; his conduct since the pool conclusively proves it. Having paid a dear price under so many patents dealing in different degrees with the elastic top, self-supporting hose, he has unfalteringly stood for full and free licensing, to one and all, at one very moderate royalty, only 2¢ per dozen pairs for all the patents in the pool, when he alone paid 4¢ per dozen pairs of half hose under Davis patent alone, thus leaving Davis with the other patent rights on children's and Misses hosiery. It is significant that the patents in pool here are complimental and not competitive. The combination of the patents here comes within the limits of United States v. Winslow, 227 U.S. 202, 33 S.Ct. 253, 57 L.Ed. 481. The three parties to the instant pool were Interwoven interested only in manufacturing half hose, M. B. Davis and Co., interested only in children's and Misses hosiery, and Scott and Williams, a manufacturer of machinery. The patent rights held and exercised by each were not competitive with the others and when these patents were assigned to the Davis Company under one ownership no disadvantage accrued to other hosiery manufacturers nor harm to the public. Indeed the evidence discloses that Davis Company has made available to any manufacturer under a license to do anything under one and all of the fifteen patents at 2¢ per dozen pairs. Suppositions and presumptions of evil or criminal intent might be indulged if the evidence was silent; here, however, it overwhelmingly shows an utter absence of such intent, or of monopoly, not sanctioned under the patent law. The size of an organization often causes some people to condemn it. The law of the land has not yet reached that standard. United States v. United Shoe Machinery Co., 247 U.S. 32, 38 S.Ct. 473, 62 L.Ed. 968; Standard Oil Co. v. United States, 283 U.S. 163, 151 S.Ct. 421, 75 L.Ed. 926. A careful examination of the long record in this case discloses no evidence to warrant a finding of a violation of the Anti-Trust law. The cases relied on by the defendants are clearly distinguishable and do not apply to the facts of this case.

The defense of mis-use rests upon a false premise. The plaintiff offered the trade the use of all of the fifteen patents for 2¢ per dozen pair. The plaintiff correctly assumed that a manufacturer who procured a license under one ought to have the benefit of all. Surely that does not show an evil purpose. Such a manufacturer would then be free from claims of infringement and the expense of defending suits. Undoubtedly the Davis Co. could not condition its license so as to tie to the use of the patented device or process the use of other devices, processes or materials not embraced in the patents. This the Davis Company did not attempt to do. Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852.

United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 131, 92 L.Ed. 1260, and similar cases upon which the defense is based, are inapplicable to the facts in this case.

The patents in suit had a hard struggle over many years before they were issued; the patentees have been defied by a combination of 172 hosiery manufacturers who employ the inventions without the payment of royalties and who have combined together and pay the cost of the defense in this suit because their interest are alike and as might be expected every conceivable defense has been presented with great skill. The result is not encouraging to an inventor. Indeed a patent, however valid and however flagrantly infringed, would be worthless in the hands of a person of small means if it had to survive the obstacles which have confronted the patents in suit. This is a battle by the defense to ignore the patents until a court of last resort compels a course otherwise. The defenses necessarily require a consideration of this attitude.