**ROHM & HAAS COMPANY, Appellant,**

v.

**ROBERTS CHEMICALS, Incorporated, Appellee.**

No. 7370.

United States Court of Appeals Fourth Circuit.

Argued April 2, 1957.

Decided May 27, 1957.

4. Chapter 9, § 68-9-14, A.C.L.A.1949.

Arthur G. Connolly, Wilmington, Del., and Theodore S. Kenyon, New York City (Jackson, Kelly, Holt & O'Farrell, William T. O'Farrell, Charleston, W. Va., Connolly, Cooch & Bove, Wilmington, Del., and Kenyon & Kenyon, New York City, on brief), for appellant.

Robert F. Davis, Washington, D. C. (John B. Fisher, Charleston, W. Va., Martin Fleit, Washington, D. C., and Stevens, Davis, Miller & Mosher, Washington, D. C., on brief), for appellee.

Before PARKER, Chief Judge, and SOPER and SOBELOFF, Circuit Judges.

SOPER, Circuit Judge.

This suit was brought for infringement and contributory infringement of United States Reissue Patent No. 23,742 which was issued to Rohm and Haas Company, assignee of William F. Hester, deceased, on November 24, 1953, on an application filed October 24, 1952. The original patent, No. 2,317,765, was issued to Hester, assignor, to Rohm and Haas Company on April 27, 1943, on an application filed August 20, 1941. The original patent made claims to fungicidal compositions suitable for application to living plants, containing as an active in-

gredient the disodium salt of ethylene bisdithiocarbamic acid, familiarly known as Nabam, or related salts of the same acid which were specified in the five claims of the patent. The same claims were applied for but denied in the application for reissue and the present suit is based on eight claims of the reissue patent which differ only from the original patent in that they call for a *process* of controlling fungus growth on living plants which comprises applying to the plant a fungicidal composition having as an active ingredient one of the salts of the same acid mentioned in the claims of the original patent, or additional salts thereof. The District Judge held that the reissue patent was invalid for anticipation and dismissed the complaint.*

There is no question that the discovery of the useful qualities of Nabam and its related salts has been followed by wide use in the agricultural field. There had long been the need among farmers for a fungicide which would kill the fungus without in some way damaging or destroying the plants themselves, and the problem was to develop a material with the fungicidal properties of high efficiency with a minimum toxicity to the growing plants. Nabam was the first of the fungicides to possess these properties in a satisfactory measure. The discovery was made by Hester, a chemist in the laboratory of Rohm and Haas, after a great number of compounds had been tested according to standard procedure. Nabam had theretofore been known to the chemical world as the product of interaction of ethylenediamine with carbon disulfide but it does not seem to have been made use of for practical purposes. It was tried, however, by Hester along with many other compounds and it was only after one or two unsuccessful tests that it was found to possess the qualities desired.

* 1. The claims of the respective patents were as follows:

### Claims of the Original Hester patent:

1. A fungicidal composition having as an active ingredient a salt of an alkylene bisdithiocarbamic acid.

2. A fungicidal composition having as an active ingredient a salt of ethylene bisdithiocarbamic acid.

3. A fungicidal composition having as an active ingredient the disodium salt of ethylene bisdithiocarbamic acid.

4. A fungicidal composition having as an active ingredient the cupric salt of ethylene bisdithiocarbamic acid.

5. A fungicidal composition having as an active ingredient the ferric salt of ethylene bisdithiocarbamic acid.

### Claims of Hester reissue patent:

The same composition claims were applied for, but denied, and only process claims allowed, as follows:

6. The process of controlling fungus growth on living plants which comprises applying to the plant a fungicidal composition having as an active ingredient a salt of an alkylene bisdithiocarbamic acid.

7. The process of controlling fungus growth on living plants which comprises applying to the plant a fungicidal composition having as an active ingredient a salt of ethylene bisdithiocarbamic acid.

8. The process of controlling fungus growth on living plants which comprises applying to the plant a fungicidal composition having as an active ingredient a bivalent metal salt of ethylene bisdithiocarbamic acid.

9. The process of controlling fungus growth on living plants which comprises applying to the plant a fungicidal composition having as an active engredient the sodium salt of ethylene bisdithiocarbamic acid.

10. The process of controlling fungus growth on living plants which comprises applying to the plant a fungicidal composition having as an active ingredient the cupric salt of ethylene bisdithiocarbamic acid.

11. The process of controlling fungus growth on living plants which comprises applying to the plant a fungicidal composition having as an active ingredient the ferric salt of ethylene bisdithiocarbamic acid.

12. The process of controlling fungus growth on living plants which comprises applying to the plant a fungicidal composition having as an active ingredient the zinc salt of ethylene bisdithiocarbamic acid.

13. The process of controlling fungus growth on living plants which comprises applying to the plant a fungicidal composition having as an active ingredient the cadmium salt of ethylene bisdithiocarbamic acid.

Since the discovery it has had great commercial success and seems to have finally solved a long-standing problem. It was introduced in 1944 and since that year, when $100,000 worth of material was sold, sales have progressively increased until, it was estimated at the time of the trial, ten times as much Nabam was sold as the other well-known fungicides Ziram, Ferbam and Thiuram, which are manufactured and sold by the duPont Company. The duPont Company itself began to manufacture and sell Nabam and its related salts in 1947 and took a license under the reissue patent after it was granted in 1953.

The principal attack on the validity of the invention is based on the United States Patent No. 1,972,961 to Tisdale and Williams, assignors, to E. I. duPont de Nemours and Company, issued on September 11, 1934, on an application filed May 26, 1931. The invention relates to disinfectants and particularly to methods of controlling the growth of fungi and microbes. Its object was to find a disinfecting material which would be useful not only as a general disinfectant but also as a fungicide and microbicide and would prevent the growth of fungi and bacteria on wood, leather, fruits, plants and other organic material. The specification proposed the treatment of plants or other organic material with a derivative of dithiocarbamic acid and showed that dithiocarbamic acids result from the interaction of carbon disulfide with the more basic amines. A score of amines suitable for the purpose was listed.

For the production of dithiocarbamic acid the use of one mole of an amine in combination with one mole of carbon disulfide was prescribed, and it was said that all these compounds contain an arrangement of nitrogen, carbon and two sulphur atoms in a group, usually depicted as N-C-S-, and that compounds which

$$\overset{S}{\overset{\shortparallel}{S}}$$

contained this group are of value for the control of fungi of various kinds. It was however shown by uncontradicted evidence that the number of organic compounds which could be formed from the materials mentioned in the specification was infinite and that many of them would not have fungicidal properties.

There is no mention in the patent of Nabam nor any specific direction for its production, nor is there any mention of the salts of bisdithiocarbamic acid, as for example Nabam which contains two of the N-C-S- group and therefore possesses particularly effective fungicidal properties. The examples in the patent are confined to mono compounds. The contention is nevertheless made that enough was disclosed in the specification of the patent to teach an experienced chemist that Nabam would be produced by following the procedure set out, and that it would be an effective fungicide. Amongst the amines listed in the specification was the b-amino ethyl amine, and the evidence shows that if it is used in the way prescribed in the patent, employing one mole of the amine with one mole of carbon disulfide, a composition containing 30 per cent of Nabam will result. Furthermore, it was asserted that an experienced chemist, knowing that b-amino ethyl contains two amine groups, would normally use two moles of carbon disulfide to react with both amine groups, and that if this were done substantially all of the resulting compound would be salt of the bisdithiocarbamic acid, or Nabam. Accordingly, it is said the Tisdale patent teaches a qualified chemist not only how to make Nabam and its related salts but, also, that it would be an effective fungicide, and therefore Hester taught nothing new. The Judge approved this contention.

We think the evidence does not support this conclusion. With the knowledge now available a skilled chemist might find in the Tisdale patent sufficient information to anticipate the Hester invention; but it seems certain that Tisdale himself was unaware of the virtues of the bis product, although one of his purposes was to find an effective fungicide. Although he singled out the N-C-S- group as the effective ingredient, he did not show that one of his listed amines would produce the bis acid, nor did he

proclaim that such a product was more effective than the compositions covered by his claims.

■■ It is a significant and stipulated fact that long before Tisdale the salts of alkylene *bis*dithiocarbamate were disclosed in the Nagele article of 1912 and before the Hester patent by the Yakubovitch article of 1939; nevertheless, the superior quality of the substance as a fungicide lay hidden from the world. Practical men in the art who possessed ample facilities and were advised by qualified research chemists did not find in these prior writings or in the Tisdale patent the solution of the problem. That patent was owned by the duPont Company, which for years had been active in the manufacture and sale of fungicides, but it had not learned that the answer to their problem lay in the use of the bis rather than the mono compositions. It had manufactured the mono compounds of Tisdale known as Ferbam and Ziram, which proved decidedly inferior to the new product of Hester after it was disclosed by his patent. In consequence, the duPont Company joined in the manufacture and sale of Nabam in 1947 and took a license under the Hester patent after it was reissued in 1953. Thus the evidence conclusively shows that the case does not fall within the rule that skilled experiments in the laboratory, where the principles of investigation are well known and the achievement of the desired end requires only routine work, do not involve invention. Mandel Bros. v. Wallace, 335 U.S. 291, 69 S.Ct. 73, 93 L.Ed. 12; General Electric Co. v. Jewel Incandescent Lamp Co., 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43; cf. Dewey & Almy Chemical Co. v. Mimex Co., 2 Cir., 124 F.2d 986, 989; General Electric Co. v. Hoskins Mfg. Co., 7 Cir., 224 F. 464; Diamond Rubber Co. v. Consolidated Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527. Since Hester tried and succeeded where Tisdale and the duPont Company tried and failed, we may fairly conclude that the discovery was not obvious to persons skilled in the art.

When Roberts Chemicals, Inc., the defendant in this case entered the field it did not select the Tisdale fungicides but, instead, followed the teaching of the Hester patent and manufactured Nabam, thus adding its tribute to the superiority of the product.

■■ It is next said that the claims of the reissue patent are indefinite to the point of invalidity in that they fail to state the proportions of the salt to be used in the fungicide or, in other words, do not prescribe the amount of water to be used with the chemical compound in its application to growing plants. We think that the contention is not well taken. While it is essential that the elements of a patented compound must be stated in the claims, Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 277, 69 S.Ct. 535, 93 L.Ed. 672, it is not necessary to include operating details described in the specifications, which are routine and well known to the art. As was said in Proctor & Gamble Mfg. Co. v. Refining, Inc., 4 Cir., 135 F.2d 900, 906:

> "There are many situations in the practice of the arts in which specific directions are properly omitted from the claims of patents because greater definition is either impracticable or is unnecessary to inform the art, and would serve only unduly to limit the scope of the invention or to invite evasion by those who desire wrongfully to misappropriate the substance of the invention."

The defendant advances additional contentions which relate specifically to the grant of the reissue patent and challenge its validity. The original patent, as we have seen, was granted on April 27, 1943, and application for the reissue patent was not filed until more than nine years later, on October 24, 1952. It was identical with the original except that it included not only the composition Claims 1 to 5 of the original but also the process Claims 6 to 13 set out above. The Patent Office allowed the latter claims but rejected the former, whereupon the owner of the patent cancelled the com-

position claims, without conceding their invalidity, and the patent was reissued with the process claims alone.

The defendant takes the broad position that Rohm and Haas, owners of the Hester patent, did not have any valid ground for the reissue in order to obtain the process claims. The reissue section of the Statute (35 U.S.C. § 251) authorizes a reissue whenever through error a patent is deemed wholly or partly inoperative or invalid by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had the right to claim in the patent. The defendant says that the inventor could have included process claims in his original application if he had seen fit to do so and they would have been granted; and also that inventor's attorney was aware of this fact since he had successfully applied for the grant of process claims in other situations.

■ The defendant further contends that if there was an error in the original application, within the meaning of the statute, it was easily discoverable by the patentee and hence it became his duty promptly to correct the error, and having failed to do so for nine years his right to a correction has been lost by unreasonable delay. The decisions support the positions that a reissued patent may not be granted in the absence of the kind of error defined in the statute, and that the failure to make claim to subject matter covered by the original patent within a reasonable time constitutes a dedication thereof to the public. Miller v. Bridgeport Brass Co., 104 U.S. 350, 26 L.Ed. 783; Sontag Chain Stores Co. v. National Nut Co. of Cal., 310 U.S. 281, 60 S.Ct. 961, 84 L.Ed. 1204; General Radio Co. v. Allen B. Du Mont Laboratories, 3 Cir., 129 F.2d 608.

In considering this line of argument, however, we must give heed to the peculiar circumstances of this case. It is true that process claims were available at the time of the original grant and that their omission was obvious from a casual inspection of the patent, and a serious question would be presented if it were shown that intervening rights had accrued during the long interval between the grant of the original and the application for the reissued patent. But no such contingency has arisen, and the filing of the application for reissue at so late a date is explained by changes in the law which clarified the rights of the patentee.

The evidence shows that the patentee made no effort to enforce the original patent until recent years. The reason was that it was practically unenforcible except against contributory infringers who sold Nabam to the farmers knowing that it was to be used by them as a fungicide; and the owner of the patent was apprehensive that if it sued infringers of this sort, it would be adjudged guilty of unfair use of the patent. The claims of the patent did not cover Nabam itself, since that substance had been made prior to the application for the patent, but were limited to Nabam as a fungicidal composition; and the patentee was confronted by the established rule of the patent law that a patentee selling an unpatented part or component for use in a patented combination or process is denied enforcement of the patent against competitors selling similar articles for the same purpose. See Carbice Corporation of America v. American Patents Development Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819; Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371; Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376. The patentee was also confronted with the settled rule that a new use of an old product was not patentable, laid down by the courts prior to the enactment of the patent statute of 1952. Hutzler Bros. Co. v. Sales Affiliates, Inc., 4 Cir.1947, 164 F.2d 260, 264; Stromberg Motor Devices Co. v. Zenith-Detroit Corp., 2 Cir. 1934, 73 F.2d 62, 64. Rather than face the uncertainties of litigation under these circumstances, the owner of the patent did not bring suit for infringement prior to the reissue but engaged in the sale of the

article in competition with other manufacturers.

This situation was materially changed by the passage of the new patent statute of July 19, 1952, Ch. 950, 66 Stat. 792. By this enactment the patent statutes and some prior case law were codified and various revisions and amendments of the law were made. The Act took effect on January 1, 1953, and was made applicable to unexpired patents granted prior to the effective date except as otherwise provided. See § 4(a), 66 Stat. 815, 35 U.S.C.A. note preceding section 1. Section 100 of the new Act modifies the old rule as to the patentability of a new use of an old product by providing that the term "process" includes a new use of a known process, composition of matter or material. The result is that one who invents or discovers any such process may obtain a patent therefor under the provisions of § 101.

Section 271 of the statute re-enacts the rule that whoever sells a component of a patented combination or composition or a material for use in practicing a patent process, constituting a material part of the invention, knowing the same to be especially made or adapted for use in infringement of the patent, is liable as a contributory infringer; but the rule is limited to a material which is not a staple article or commodity of commerce.

It was to take advantage of these new provisions that Rohm and Haas made application for the process claims on October 24, 1952, shortly after the passage of the statute. The reissued patent was granted on November 24, 1953, after the effective date of the statute, and we think that the validity of the reissue should be construed in the light of its provisions. Thereby it was made clear that process claims covering the new use of Nabam as a fungicide on living plants were patentable; and since the evidence shows that Nabam, apart from its use as a fungicide, is not a staple article of commerce, it became practicable to bring suit for contributory infringement against sellers of the composition who knew that it was especially adapted for use in in-

fringement of the patent. Manifestly the term "process" was given a new significance by the Act of 1952, of which the owner of the patent was free to avail himself. Even if it be thought that the original claims were enforcible under the new enactment, still the owner of the patent was entitled to the new claims which, without enlarging the scope of the original claims of the patent, were phrased to cover a process within the express terms of the statute.

■ It cannot be contended that the defendant or anyone else was prejudiced by the withdrawal of the claims of the original patent and the grant of claims confined to a process for the use of a fungicide. The defendant corporation, a West Virginia manufacturer of chemicals, was organized in 1953 for the purpose of manufacturing and selling chemical compounds, including Nabam. By that time the compound had attained widespread use by farmers as a fungicide. Since that time the defendant has placed substantial quantities in the hands of farmers with detailed instructions regarding its use on growing plants. Thus it is clear that the defendant acquired no intervening rights prior to the reissue and has been guilty of direct as well as contributory infringement.

■ It is also charged that the reissue enlarges the scope of the claims of the original patent and therefore was granted in violation of the provision of the Patent Act, 35 U.S.C. § 251, which provides that no reissue patent shall be granted enlarging the scope of the claims of the original patent unless applied for within two years from the grant of the original patent. A comparison of the claims of the two grants demonstrates that this contention is ill-founded. Claim 1 of the original patent covers a fungicidal composition having as an active ingredient a salt of an alkylene bisdithiocarbamic acid, while Claim 6 of the reissue covers the process of controlling fungus growth on living plants which comprises applying to the plant a fungicidal composition having as an active ingredient a salt of an alkylene bisdithio-

*carbamic acid.* The limitation of the process to the application of the fungicide to living plants is not found in the claim of the original and thus it cannot be said that the later claim is broader than the original. The usual test in determining such a disputed point is whether the claims of the reissue could be infringed by any procedure which would not infringe a claim of the original patent. Schenk v. United Aircraft Corp., D.C.Conn., 43 F.Supp. 679, 685, modified Picard v. United Aircraft Corp., 1 Cir., 128 F.2d 632, certiorari denied 317 U.S. 651, 63 S.Ct. 46, 87 L.Ed. 524. It is apparent that there is nothing that would infringe the process claims of the reissued Hester patent that would not at the same time infringe the claims of the original patent.

Reversed and remanded for further proceedings in accordance with this opinion.