Frank R. REDMAN and Redman Process American Corp., Plaintiffs,

v.

STEDMAN MANUFACTURING CO., Defendant.

Civ. No. 846–G.

United States District Court
M. D. North Carolina,
Greensboro Division.

Sept. 23, 1957.

Thornton H. Brooks, Greensboro, N. C., Howson & Howson, Philadelphia, Pa., for plaintiff.

Welch Jordan, Greensboro, N. C., Pennie, Edmonds, Morton, Barrows & Taylor, New York City, for defendant.

HAYES, District Judge.

On May 20, 1952, F. R. Redman obtained the Patents in suit, No. 2,597,528 for an apparatus and No. 2,597,530 for a method of treating tubular knitted fabric to prevent the garment made therefrom from shrinkage after washing and laundering. These patents issued on an application filed October 22, 1948. Patent '528 may be called Redman's Normalizer and '530 the Normalizing. These patent rights are now owned by Redman with exclusive licensing rights vested in his co-plaintiff. While Stedman Manufacturing Co. is the defendant named as the user of the accused device, Tubular Textile Manufacturing Co. is the manufacturer and owner and lessor and is in charge of and conducting the defense and hereafter will be referred to as the defendant.

The defenses are (1) invalidity based on prior art and (2) non-infringement. Little need be said on the defense of invalidity. The knitting industry is an old and wide spread business. Practically all of the larger knitting companies are members of Underwear Institute which exists as an agency to promote the welfare of the industry. It is agreed that there existed a serious shrinkage problem in knitted fabrics before 1934. The fabric is knitted in courses and wales on a tubular head and the fabric is knitted into 100 yard lengths. After it is thus knitted, it is processed by washing, bleaching and dyeing and extracting. When the fabric got wet and heavy, the moving of it exerted a "pull" or "drag" which elongated the stitches

and narrowed their width, thereby distorting the fabric. After it had been treated and dried to be cut into garments, it was discovered by the entire industry that the garments, afer being worn and laundered, would shrink out of fit by drawing up in length and broadening in width. The problem was universally known and ways and means to solve the problem were universally sought by the manufacturers and the manufacturers of knitting machinery.

Redman had obtained two patents and had an application for another patent pending dealing with the problem, but they are not involved here. He had copyrighted the name "Redmanized". In 1944 the Underwear Institute became interested in the Redman inventions. It appointed a committee of mechanical experts from the larger knitting companies to investigate them and make recommendations. Pursuant thereto negotiations with Redman culminated on May 1, 1945, in a written trust agreement between Redman and Trustees named by the Underwear Institute. The important features of the agreement were: Transfer by Redman to the Trustees of his patents and pending application, *also any patents or applications for patents made by him during the life of the contract;* he was to be employed by the Trust at $12,000 per annum and use his knowledge in the development, improvement and commercialization of the apparatus and process to overcome shrinkage in knitted fabric; the Trust would grant licenses and collect fees; employ counsel and procure machinery to carry out the objects of the Trust; it was to secure $75,000 in contributions from knitting companies and do all of the needful things to develop and commercialize Redman's inventions. The document enumerates in its 26 pages the obligations and benefits respectively of Redman, the Trustees and the contributors and licensees.

There were 59 contributors among knitting companies whose contributions during the life of the contract amounted to $121,500. It is significant that among the manufacturers who contributed $5,000 or more were Atlas Underwear Co., William Carter Co., Gibbs Underwear Co., P. H. Hanes Knitting Co., Utica Knitting Co. and Wilson Brothers. Even Munsingwear, who had wrestled with the problem since 1934 and had obtained some patents relating thereto, contributed $3,000. The voluminous record is replete with written documents from 1945 to 1950, when the Trust was terminated, which show the struggle to solve the problem and the experiments and progress made by the Trust, including Redman, culminating in the application No. 55,963, on Oct. 22, 1948, on which the patents in suit issued.

Having spent three weeks in the trial and observing the machines demonstrated and that much time studying the record, briefs and requests, the court is thoroughly satisfied that there is novelty in both patents in suit and that the claims in suit are valid. The innumerable publications and patents relied on by the defense do not constitute anticipation nor teach the art involved in the patents in suit. If these documents, one or all of them combined, taught or suggested the Redman invention to those skilled in the art, as is now so earnestly advanced by the defendant, it is surpassingly strange that none discovered it when all were diligently seeking it and why the leaders in the industry resorted to such frantic efforts for the solution of this long standing problem. Rohm & Haas Co. v. Roberts Chemicals, 4 Cir., 245 F.2d 693, 697; Otto v. Koppers Co., 4 Cir., 246 F.2d 789.

The Trust was dissolved 9th of Dec., 1950, due to some of the manufacturers leasing the accused device from the defendant. The Underwear Institute and the Trustees recognized that the accused device competed with the Redman patents and pending application, and that infringement would be involved; that the institute and the Trustees could not protect the Redman rights with the possibility of having to sue its members. It sought and obtained Redman's consent to dissolve the Trust and all patent and all trade mark rights were transferred

to Redman. It is clear that the manufacturers were eager to get into operation at the earliest moment a machine and method could be obtained which would produce knitted fabrics that would not shrink out of fit.

In spite of the contention of the defendant to the contrary, the accused device constitutes infringement of the Normalizer of '528 patent and the process infringes the process of '530 patent in suit.

The accused device used by Stedman produced the samples taken by Pressnell, Worthington and Lawson and its operation constituted a normalizer as described and claimed in the '528 patent in suit and the method employed in processing these samples constituted a normalizing operation under the Claims of the '530 patent.

Claim 1 of the '528 which is copied as footnote 1 is typical of the others.[1] The accused device has means (belts) for moving the tubular knitted fabric lengthwise through a treatment zone while affording lengthwise freedom of the fabric. Its frame and pulleys of the propeller are within the treatment zone and operate to internally expand the tubular fabric widthwise to effect lengthwise shortening without tension on it lengthwise and means are employed to permit the fabric to relax and to reposition the stitches from their distorted shape while processed back to their substantial shape after being knitted and before the processing operation.

In like manner Claim 1 of patent '530 is typical. See footnote 2.[2] In the accused device the belts operate to move the tubular knitted fabric lengthwise through a treatment zone while providing lengthwise freedom of the fabric. As the fabric moves through this treatment zone, the fabric is expanded widthwise by the frame and pulleys of the propeller adjusted sufficiently wider than the width of the fabric as it entered the process to effect lengthwise shortening (condensing) of the fabric. Thereafter, the finishing rolls and roll-up rolls operate to permit the fabric to relax both in width and in length. These steps of moving the fabric in the treatment zone with lengthwise freedom while being internally expanded widthwise to shorten and condense the fabric, then providing means for the fabric to relax freely, constitute, in their combination of methods, the restoration of the stitches both widthwise and lengthwise to their original knitted form and thereby restores the fabric substantially to its normal condition, thereby effectively overcoming the contortion of the stitches and of the fabric caused by processing after leaving the knitting head.

The defendant set up 31 U.S. and foreign patents and printed publications and several prior uses to show anticipation or lack of invention in the subject matter of the two Redman patents in suit. But they do not disclose or embody the Redman inventions. They relate to mill shrinkage and controls to avoid waste in

---

1. Apparatus for reducing shrinkage in tubular knitted fabric which has been elongated lengthwise and narrowed widthwise by processing subsequent to knitting of the fabric, comprising means for moving the tubular knitted fabric lengthwise through a treatment zone while affording lengthwise freedom of the fabric, means within said zone for internally expanding the tubular fabric widthwise to effect lengthwise shortening or condensing of the fabric, and fabric-handling means permitting the fabric to relax, whereby to effect repositioning of the fabric stitches substantially to their original knitted form and restoration of the fabric substantially to its normal condition.

2. A method of reducing shrinkage in tubular knitted fabric which has been elongated lengthwise and narrowed widthwise by processing subsequent to knitting of the fabric, and the stitches of which are distorted lengthwise and widthwise, said method comprising moving the tubular knitted fabric lengthwise through a treatment zone while providing lengthwise freedom of the fabric, internally expanding the tubular fabric widthwise within said zone to effect lengthwise shortening or condensing of the fabric, and permitting the fabric to relax, whereby to effect repositioning of the stitches substantially to their original knitted form and restoration of the fabric substantially to its normal condition.

producing garments but fall far short of eliminating or teaching how to eliminate shrinkage after wearing and laundering. It must be borne in mind that this is the invention of the patents in suit. It is definitely and conclusively established that the prior art utterly failed to accomplish this result. Defendant's expert was unable to name any one prior art which more nearly anticipated the patents in suit.

It is appropriate to quote what Judge Parker so well said in Reynolds v. Whitin Machine Works, 4 Cir., 167 F.2d 78, at page 83:

> "Defendant has cited 21 patents as basis for its contention that complainants' invention is lacking in novelty; and this in itself is evidence of the weakness of the contention. Such a citation of so many prior patents almost always means either that none of them is in point and that the patentee has brought together for the purpose of his inventions devices to be found in prior patents of different character, or that there have been prior attempts to solve the problem with which he was confronted which have not met with success. * * * Patents for useful inventions ought not be invalidated and held for naught because of such excursions into the boneyard of failures and abandoned experiments."

The Chief Engineer of Tubular Textile Machinery Corporation, Jules G. Walters, and Eugene Cohn and Samuel Cohn, executive officers of the corporation, on December 10, 1949, filed application for patent covering their alleged inventions for method of and apparatus for treating tubular textile fabrics which culminated in patent 2,589,344. What they said then covered the state of the prior art, excluding the patents in suit, as follows:

> "This invention relates to the treatment of tubular textile fabrics and *particularly* to *a novel method of preshrinking and setting such fabrics so that the garments made therefrom will not be subject to fur-ther substantial shrinkage as the result of laundering."

Then it describes the state of the Art and the standard processing procedure which utilized longitudinal tension, and said:

> "Because of the longitudinal tension which is maintained throughout the steam treatment, no shrinkage is permitted, and consequently the finished fabric is subject to shrinkage when laundered."

The next two paragraphs of that patent are very significant and are:

> "It is the object of the present invention to *provide a method of and apparatus for treating tubular textile fabric whereby the fabric is longitudinally compressed before, during or after steaming and is not therefore subject to substantial shrinkage as a result of laundering,* an object which has long been considered desirable but heretofore has not been obtainable in the treatment of tubular textile fabrics."

> "Another object of the invention is the provision of a method of and an apparatus for setting the stitches of a tubular textile material in their natural form, and contour and free of internal stress, with a reduction in the inherent residual shrinkage so that garments made therefrom are not subject to modification by substantial shrinkage." The court has supplied the italics.

Although the foregoing patent issued March 18, 1952, it is not prior Art to the filing of plaintiffs' application on Oct. 22, 1948, on which patent '528 and patent '530 issued, although the issuing date was May 20, 1952. While application No. 159,296 was filed May 1, 1950, the subject matter of the co-pending application No. 55,963 was divided and was a continuation-in-part thereof.

The defendant contends that plaintiff learned about defendant's method and adjusted his claims to embody defendant's method. The plaintiff contends that the defendant obtained knowledge of plain-

tiff's invention and appropriated it and tried to beat him in filing an application. Tedious and careful consideration has been given to these contentions. Here again the evidence convinces the court that the defendant's contention is not sustained but that the evidence impels a finding in favor of the plaintiff's contention.

The Redman apparatus and method were demonstrated at an open house of the industry (knitting) in Spring City, on April 29, 1948. It is true that Eugene Cohn testified that no one connected with his company attended, yet he admits he was told about it by several of his customers. Ex. 73 which is an office memorandum dated June 28, 1948, Eugene Cohn to Mortimer Cohn, records the information Eugene obtained from Niel at Nazareth. This at least discloses the extreme spreading of the fabric after it has been bleached and extracted. It also discloses that the operation is without tension, allowing the cloth to lie in ripples (relaxed) while drying. Ex. 73C is a letter dated Dec. 23, 1948, from Flagg Knitting Co. to Tubular Textile Machinery Corp. and enclosed a clipping from Journal of Commerce from which a part is quoted:

"Utica—Dec. 20. Six Underwear Mills have already signed lease agreements for the new Redman Shrinking Machine at a cost of $40,-000.00 each, President Roy A. Cheney of the Underwear Institute told a meeting this weekend of local manufacturers."

"The new pre-shrinking machine produces 800 pounds of fabric an hour, shrinking it and drying it. While the average shrinking of underwear in washing machines has been determined by the Bureau of Standards to be from 17 to 18 per cent, the new Redman machines have held shrinking to 3 to 4 per cent, Mr. Cheney said."

On January 3, 1949, a memorandum was sent from M. C. to E. C. and J. C. ("x. 73B), subject Redman Process, in which he referred to the clipping and its contents and said:

"I would like you to see this clipping and to then promptly discuss with me steps to be taken and to further investigate what is cooking in this situation."

The next memorandum is dated 6/8/50 from J. C. to E. C. telling of information from Mr. Lowery of E-Cut Knitting Mills, only part of which bears on this subject:

"I asked him about the Redman Process and he told me that the machine in Spring City is working nicely and that E-Cut is getting some very nice results on their own cloth from the Redman Process. He also told me that the Redman machine up at Glendale, N. Y. which is Perry Knitting, is also running and he told me that the third machine for Pottsville Bleach and Dye is now at Pottsville on a siding ready to be installed."

On June 22, 1950, a memorandum is sent from J. G. W. (Walters Chief Engineer of Tubular, etc.) to J. C. (Joseph Cohn) on subject of Redman Head. This memorandum, Ex. 74, consists of four pages, single space typewritten details. The first paragraph starts with this sentence:

"Attached hereto is drawing D3–95 in duplicate showing the system and aparatus that Redman uses for 'normalizing' his fabric."

Later he states:

"From the moving pictures that we saw at the show these rolls No. 1 are obviously driven."

Later he states:

"Pop feels that we should go back to patent 2,228,001, issued January 7, 1941, Claim No. 6 which he claims is an excellent Claim on what Redman is doing as shown in the movie."

After discussing the problems presented by the Redman Head, it said:

"It is Pop's thought that possibly we could obtain some patent protec-

tion on a head similar to Redman's by adding belts such as shown in the sketch to his head or at least to exhaust the possibilities of propelling cloth by belts by these means."

The evidence shows that defendant was appropriating to its use the Redman inventions instead of Redman appropriating to himself the alleged inventions of Cohn and Walters. There is no question that Claims 1, 3 and 7 to 11, inclusive, of '530 patent read on and find full response in the application No. 55,963, filed Oct. 22, 1948, and the patent is entitled to that filing date. Davis Co. v. Baker-Cammack Hosiery Mills, D.C., 86 F.Supp. 180, 186, affirmed 4 Cir., 181 F.2d 550, 558.

The first tensionless calendar was a sample machine for demonstration purposes and retained by it. This machine was shown to Dunmore of Utica and King of Munsingwear during April, 1949. Defendant offered to build machines substantially like the sample and to lease them. The first order was received May 29, 1949. Thereafter the machine was built. Thus the first order and the first machine for the market occurred subsequent to May 1, 1949, or within one year of the last application filed May 1, 1950. Even that machine had to have the bouncer roll added in August. The sample as such was incomplete and did not constitute public use or offered for sale within the statute. Sturdevant Co. v. Massachusetts Hair and Felt Co., 1 Cir., 124 F.2d 95, 97. Certiorari denied 315 U.S. 823, 62 S.Ct. 917, 86 L.Ed. 219; Rohn & Haas Co. v. Roberts Chemicals, 4 Cir., 245 F.2d 693; Long Manufacturing Co. v. Holliday, 4 Cir., 246 F.2d 95.

Stedman Manufacturing Co. has infringed the patent claims in suit by using the accused device and Tubular Textile Machinery Corporation has also infringed the patent Claims in suit by making and leasing to Stedman for use in this district the accused device. The latter company has assumed, controlled and conducted the defense of Stedman in this case pursuant to its contract with Stedman and is therefore bound by the judgment herein. Baker-Cammack Hosiery Mills v. Davis Co., supra; Aghnides v. S. H. Kress & Co., D.C., 140 F.Supp. 582, 587, affirmed 4 Cir., 246 F.2d 718. Judgment in accordance herewith will be entered.