STEDMAN MANUFACTURING COMPANY, Appellant,

v.

Frank R. REDMAN and Redman Process American Corporation, Appellees.

No. 7563.

United States Court of Appeals Fourth Circuit.

Reargued April 23, 1958.

Decided July 17, 1958.

John Vaughan Groner, New York City (W. Brown Morton, Jr., Marvin E. Frankel, New York City, Welch Jordan, Greensboro, N. C., W. Brown Morton, New York City, Edward H. Dowd, and Pennie, Edmonds, Morton, Barrows & Taylor, New York City, on the brief), for appellant.

Dexter N. Shaw, Philadelphia, Pa. (Charles H. Howson, Jr., Howson & Howson, Philadelphia, Pa., Thornton H. Brooks, and Brooks, McLendon, Brim & Holderness, Greensboro, N. C., on the brief), for appellees.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

SOPER, Circuit Judge.

This suit for patent infringement is based on two United States Patents issued to Frank R. Redman on May 20, 1952, which relate to an apparatus and a method for treatment of tubular knitted fabrics, that is, patent No. 2,597,528 which was applied for October 22, 1948, and patent No. 2,597,530 which was applied for May 1, 1950. Patent '528 covers the apparatus and patent '530 the method of operating the apparatus. The suit was brought by Frank R. Redman and Redman Process American Corporation, the exclusive licensee of the patents, against Stedman Manufacturing Company of North Carolina, which is accused of infringing the patents by the use of a machine called a "Tube-Tex Tensionless Calender." This machine was leased by it from the Tubular Textile Machinery Corporation of New York (hereinafter called "Tubular Corporation") which is defending the suit. This appeal is taken from a judgment of the District Court wherein both patents were held valid and infringed by the defendant.

 Tubular knitted fabrics are used in the manufacture of such garments as T-shirts, children's sleepers, athletic undershirts and polo shirts. In general

terms, the purpose of the patents is to eliminate as far as practicable the shrinkage of the garments when they are laundered. For many years the knitting industry had recognized that excessive shrinkage occurred when garments of this sort are laundered and many efforts have been made to solve the problem. Redman claims that his patents provide a means and method for obtaining a fabric which is pre-shrunk to such an extent that the residual shrinkage of the manufactured garment when it is laundered has been reduced to a minimum. The defendant on the other hand contends that every element of the Redman apparatus had been previously employed in the art, and that the claims of the patent are so broad that they cover all pre-existing apparatus of the prior art and are not confined to the structure disclosed by the patents. It is further said that the Redman patents are distinguished from the prior art only in extreme width-wide stretching of the knitted material when it is treated, and that this element is not included in the claims and is not used by the defendant.

The problem which the patentee sought to solve was caused by the inherent characteristics of the tubular knitted fabric. Under the standard practice it is knitted under tension in lengths of 100 or more yards in such fashion that the stitches are loop shaped. When the fabric is stretched in length it becomes narrower in width and when it is expanded in width it becomes shorter in length. After the knitting operation is completed the fabric is subject to several wet-processing steps, under which its shape is distorted. It is pulled longitudinally under severe tension through a wet-scouring solution, then through a bleaching or dyeing solution between rollers, and then through a wash and an extractor. During this treatment the fabric is in a soft, wet and elastic state and the stitches are elongated and narrowed from the shape they had after knitting and the fabric as a whole is distorted. Later, when it is dyed and

pressed between rollers in a calendering operation at the desired width, it becomes set in this distorted condition and, when it is used in the manufacture of garments and they are subsequently laundered, the distorted stitches of the fabric return to their original relaxed condition and excessive shrinkage occurs. The purpose of the operation described in the patents is to "normalize" or restore the fabric and its component stitches or loops after the processing operations to the original undistorted condition so that the residual shrinking upon laundering is reduced to a minimum or to a small unobjectionable percentage. In this way a preshrunk knitted garment is obtained.

The apparatus depicted by the Redman patents shows the course which the material follows after it has been elongated and narrowed in the wet-processing steps. The fabric is drawn over rollers, whereby it assumes a generally flattened form, and thence it is carried by power-driven feed rolls to a spreader, consisting of a series of expanding wheels, to a take-off roller of relatively large diameter, and thence it goes to a conveyor, which transports it through a drier. As the fabric moves from the feed rolls over the spreader it is relaxed and is free lengthwise so that the stitches flow freely during the expansion. The large take-off roller moves at a slower speed than the drive rolls so that the fabric is carried away without appreciable tension and is deposited on a conveyor in a relaxed condition. The conveyor which draws the material through the drier moves at a slower speed than the take-off roll so as to permit relaxation of the fabric. The result is that the fabric is not pressed and set but has freedom both lengthwise and widthwise and the stitches are free to flow and return to their original knitted form.

Throughout the specification the emphasis is placed upon the "normalization" of the fabric by returning it substantially to the unstretched condition which prevailed after it was knitted and before it was processed. This is accomplished by feeding the fabric lengthwise

with sufficient freedom to permit width-wise expansion without subjecting it to appreciable lengthwise tension. The figures of the patents indicate the relaxation of the fabric by showing that it is disposed in loose folds lengthwise as it passes from the driving rolls to the take-off rolls and also in passing from the take-off roll to the conveyor upon which it is deposited in a relaxed condition. The "normalizing" process takes place as the fabric is advanced through the apparatus in this manner.

Claim 1, which is a typical claim in the patent, is as follows:

"1. Apparatus for reducing shrinkage in tubular knitted fabric which has been elongated lengthwise and narrowed widthwise by processing subsequent to knitting of the fabric, comprising means for moving the tubular knitted fabric lengthwise through a treatment zone while affording lengthwise freedom of the fabric, means within said zone for internally expanding the tubular fabric widthwise to effect lengthwise shortening or condensing of the fabric, and fabric-handling means permitting the fabric to relax, whereby to effect repositioning of the fabric stitches substantially to their original knitted form and restoration of the fabric substantially to its normal condition."

The critical element in this claim is expressed in the phrase "fabric-handling means permitting the fabric to relax."

A great many prior patents were cited against the Redman patents in the District Court but on this appeal the defendant has simplified the issue of validity by confining itself to a single machine which was developed by the Tubular Corporation and has been used extensively by its customers for more than twenty years. It is shown in detail in two United States patents owned by Tubular, which were issued to S. Cohn et al., namely, patent No. 2,187,644 issued January 16, 1940, and patent No. 2,228,001 issued January 7, 1941. The contention is that the disclosures of these patents invalidate the patents in suit.

Patent '644 discloses an apparatus which provides means for steaming the tubular fabric and then finishing it over a spreader whereby the fabric is distended to the desired width, and then it goes through a second steaming and is carried to the finishing rolls where it is pressed flat and set at the width to which it has been spread. After this has been done the fabric is wound on a roll.

The stated purpose of the patent is to provide uniformity of the knitted material by producing a flattened fabric tube of the desired width free from excessive or irregular longitudinal or transverse shrinking so that the longitudinal extension with relation to the transverse distention as well as the shrinking attendant upon the finishing operations may be controlled. The fabric attains and retains the final permanent width and length when it passes the finishing rolls and is wound up.

The spreader is adjusted so as to attain a predetermined width. It consists of a frame equipped with rollers which are driven so as to propel the fabric toward the finishing rolls. Since the material tends to shorten in length as it is spread, the speed of the propellers is adjusted in relation to the speed of the finishing rolls so as to avoid excessive tension of the material between the propelling and the finishing rolls. Thereby the proper relation between width and length is maintained and a uniform number of yards per pound is produced.

Patent '001 discloses the same relation of parts for the same purposes as is disclosed in patent '644. It was designed as an improvement over the machine of patent '644 and is known as the Tubular Straight Line Calender. The spreader of the '001 patent advances the fabric not merely by the co-action of the propeller rolls and the finishing rolls, as in patent '644, but also by co-action between the propeller rolls and moving belts which extend over the outside face of the spreader so as to eliminate distortions

between the marginal edge and the center portions of the fabric.

The speed between the spreader drive rolls and the pressure rolls is regulated to control the longitudinal tension of the fabric so as to give the fabric a predetermined width. The transverse tension, however, is largely determined by the width of the spreader and a variation in the ratio between longitudinal and transverse tension and involves merely a variation in the longitudinal tension. The purpose is to secure a specified width and length for a given weight of the material so as to attain a desired yield of the fabric for the manufacture of garments.

It is contended that these prior patents disclose the essentials of the patents in suit and especial emphasis is placed upon the references to variations in speed which is maintained between the sets of rollers so as to regulate the longitudinal tension upon the fabric as it is drawn through the machine. One important purpose was to eliminate as far as possible the shrinkage of the fabric during the finishing operations which had greatly troubled the industry. Thus, in patent '644 it is said that the finishing rollers are preferably operated somewhat more slowly than the propellers so that the shrinkage which takes place in the fabric during the steaming operation may be compensated by an excess delivery of fabric at the place of initial propulsion; and in patent '001 it is said that the method includes the regulation of longitudinal tension relative to transverse tension and in particular the substantial or complete elimination of longitudinal tension especially in operations involving fabric shrinkage.

These passages from the patents obviously relate to what is called mill shrinkage which occurs during the finishing operations and not to shrinkage of articles manufactured from the fabric. However, the patents also make some reference to shrinkage of the latter sort. Thus, in patent '644 it is said that during the processing operations the fabric is enabled to shrink and to establish what may be called its natural proportions in width and length and thus treated will hold its dimension and can be cut into garments which will hold their shape after laundering.

Again in patent '001 it is said that one of the advantages of the patented process is that the fabric will not change its proportions after washing in the manner or to the extent theretofore considered inevitable.

The evidence in the case, however, demonstrates quite clearly that the harmful shrinkage of garments made from the fabric *after it was processed* in these machines was in fact not eliminated. It was known that as the fabric came from the knitting machines the stitch was round but that it changed to an elongated or elliptical form after processing and then after laundering the stitch tended to return to a round shape. All are agreed that the problem had existed for many years and it was conclusively shown in the trial below that it still existed as late as 1949. In other words, the problem still persisted in spite of the structures described in the Cohn patents. This was shown not only by the testimony of witnesses experienced in the trade but by statements emanating from the Tubular Corporation itself, which is defending this suit.

Much evidence on this point was taken in the three weeks trial in the District Court. Sufficient confirmation of the persistence of the difficulty is found in the interest taken in the subject by the Underwear Institute, a trade organization in which a majority of the manufacturers of knitted underwear in the United States are members. The opinion of the District Judge shows that in 1944 the Institute became interested in the Redman inventions and appointed a committee of mechanical experts from the larger knitting companies to investigate and make recommendations. The result was that the Institute entered into a trust agreement with Redman whereby he transferred his patents and applications for patents to trustees and was employed at a salary of $12,000 annually

to continue his efforts to develop an apparatus which would avoid shrinkage of the garments made from tubular fabric. The trustees were empowered to grant licenses under the patents and collect fees. Contributions amounting to $121,500 were solicited and received from fifty-nine knitting companies to promote the work. It culminated in the filing on October 22, 1948, of the application on which the patents in suit were issued.

The first public demonstration of the Redman apparatus took place at an open house of the knitting industry on April 29, 1948, which was attended by between two and three hundred men. Between May 1948 and July 1949 fabrics were processed on the experimental machine in forty-five different mills. In the year beginning December 1949, the trustees issued a total of fifteen licenses to various knitting mills.

Meanwhile, in July 1949, the Tubular Corporation delivered the first of its accused machines, and by the end of that year leased twelve of them to various leaders in the knitting industry. This situation led to a dissolution of the Redman Trust. Since the licensees of the Tubular Corporation were members of the Underwear Institute it was confronted with the possibility of litigation involving charges of infringement of the Redman patents by certain of its own members. Accordingly, the Trust was dissolved in May, 1951 and the patents were turned back to Redman. The Institute notified its members of the dissolution of the Trust and announced that it took pride in the fact that the contributors to the Trust were the first in the field to sponsor and develop methods of pre-shrinking for knit fabrics. At the time of the trial in the District Court twenty-five licenses had been granted under the Redman patent to well known knitting mills in various parts of the country. The total payments by the licensees and the total poundage of fabrics manufactured under the patents amounted to substantial sums.

Under these circumstances a controversy has arisen as to whether Redman or the Tubular Corporation was the first to devise the apparatus to solve the problem. The defendant contends that the plaintiff first learned of its method and adjusted his claims accordingly, while the plaintiff claims that the defendant developed its machine through knowledge of the plaintiff's invention. This controversy was given careful consideration by the District Judge, who reached the conclusion that the evidence compelled a finding in favor of the plaintiff. The judge found that the Redman demonstration was made publicly in the presence of large numbers of the leaders of the industry and that information as to what occurred at the meeting was communicated to the Cohns. We are satisfied, from an examination of the record, that this conclusion is supported by substantial evidence. It is noteworthy that the application on which the patents in suit was based was filed October 22, 1948, prior to the two applications covering the new method which were filed by Cohn after the public demonstration of the Redman apparatus. These applications were filed on December 10, 1949 and January 4, 1950, respectively, and led to patents No. 2,589,344 and No. 2,589,345 which, as we shall see, cover the accused machine. The Judge correctly found that the disclosures of these later Cohn patents are not prior art references against the patents in suit.

There is additional striking evidence proceeding from the Tubular Corporation itself which shows that the machines of the earlier Cohn patents did not obviate the shrinkage of the laundered garments. In the specification for the later Cohn patent '344, the patentee described the prevailing method of processing the fabric by steaming and calendering operations and pointed out the unsatisfactory results in the following words: "Because of the longitudinal tension which is maintained throughout the steam treatment, no shrinkage is permitted, and consequently the fabric is subject to shrinkage when laundered."

A similar comment on the excessive shrinkage which was attendant upon the

earlier operations is described in the following passage in the specification of the Cohn patent '345:

"It is the object of the present invention to provide a simplified method of and apparatus for finishing tubular textile fabric whereby the fabric is spread, propelled, steamed and wound upon a roll and whereby the fabric is longitudinally compressed during the finishing operation and is not therefore subject to further substantial shrinkage. This object has been needed in the industry but never heretofore obtainable."

Again, in the proceedings in the Patent Office upon the application for Cohn patent '345, the patentee, in endeavoring to show that his invention was not anticipated in his prior patent '644, made the following statement:

" * * * It is true that in the patent (No. 2,187,644) the fabric is advanced at differential speeds so that there is some relaxation of the longitudinal tension on the fabric. However, this is merely for the purpose of compensating for shrinkage during the steaming operation, * *

\* \* \* \* \* \*

"The fact is that the apparatus described in patent No. 2,187,644 was intended merely to relax the longitudinal tension sufficiently to permit shrinkage when the steam was applied, but there was no intention in this structure, nor is any disclosed, of advancing the fabric in a manner so that riffles would be formed and all longitudinal tension eliminated. Furthermore, the patent, to accomplish its purpose, depends upon the use of the finishing rollers or calender rolls, which subject the fabric to rolling pressure equivalent to ironing. In other words, the patent does precisely what the inventors in the present application wish to avoid. \* \* \*

"From a practical standpoint, the invention as described in the present application * * * is revolu-

tionary in respect to procedures heretofore used in the art. * * * "

These statements, which were made on behalf of the Tubular Corporation in reference to Cohn patents '344 and '345, have an important bearing on the issues in this case. They demonstrate not only that the problem was not solved by the earlier Cohn patents '644 and '001 but they support the ultimate conclusion that the Redman patents are valid, because they represent the attempt of an experienced manufacturer to appropriate the long sought solution which Redman had disclosed. They serve also to show that the accused machine, the Tube-Tex Tensionless Calender, manufactured by the Tubular Corporation, infringes the Redman patents, for it is conceded that this machine is described in the Cohn patent '345. The statements in the specification of that patent are significant. It refers to the prior practice whereby shrinkage occurred in garments which had been made from fabric stretched and pressed in the processing operation, and announced the discovery that this shrinkage could be substantially eliminated if the fabric is relaxed and longitudinally "riffled" during the steaming process. The figures of the patent show that the cloth is fed to the apparatus under a slack condition by control of speeds and is advanced by a spreading and propelling device which is so constructed that the fabric is spread to the desired width and propelled in such a manner that the rearward portion is delivered at a speed in excess of that of the forward portion, whereby "riffles" are formed in the surface of the forward portion and it is freed from longitudinal tension. Immediately after the steaming process the fabric is delivered to a winding mandrel so operated that it takes up the fabric without exerting any tension. The crucial step in the operation, whereby the shrinkage of manufactured garments is minimized, is the formation of "wrinkles, creases, folds or rumples" which extend transversely across the fabric as it proceeds through the apparatus. This step,

as we have seen, is the heart of the prior Redman patent.

This compression or relaxation of the fabric longitudinally while the fabric is spread laterally to the desired width in the finishing operators does not entirely eliminate the shrinkage of the laundered garments, but it reduces the shrinkage so markedly that it is accepted by the trade as a practical improvement of great value. It may seem to involve so small an advance over the control of longitudinal tension previously employed as to have been obvious to the industry, but actually it was only after a long period of experimentation that it was hit upon and then widely approved. Therein lies its patentability. A similar seemingly small step in the papermaking industry was recognized as invention in Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523. The improvement of the process consisted merely in the elevation of the end of a moving screen so as to enable the stream of papermaking liquid stock upon the screen to keep pace with the screen itself and to run smoothly without rippling; but it increased the productivity of the machine to such an extent that it was generally adopted by the industry as the remedy of an old defect for which a cure had long been sought. Accordingly, it was held to involve invention and to be entitled to a patent. The Court said (261 U.S. at page 63, 43 S.Ct. at page 328):

"In administering the patent law, the court first looks into the art to find what the real merit of the alleged discovery or invention is and whether it has advanced the art substantially. If it has done so, then the court is liberal in its construction of the patent, to secure to the inventor the reward he deserves. If what he has done works only a slight step forward, and that which he says is a discovery is on the border line between mere mechanical change and the real invention, then his patent, if sustained, will be given a narrow scope, and infringement will be

found only in approximate copies of the new device. It is this differing attitude of the courts toward genuine discoveries and slight improvements that reconciles the sometimes apparently conflicting instances of construing specifications and the finding of equivalents in alleged infringements. In the case before us, for the reasons we have already reviewed, we think that Eibel made a very useful discovery, which has substantially advanced the art. His was not a pioneer patent, creating a new art; but a patent which is only an improvement on an old machine may be very meritorious, and entitled to liberal treatment."

We find no substance in the additional contention of the defendant that Redman's only contribution to the art was an extreme stretching widthwise of the fabric while it was being processed. This argument rests on the declaration in the specification of Redman patent '528 that normalization "can be accomplished by expanding the tubular fabric widthwise to a circumferential dimension substantially equal to the circumferential dimension at which the fabric was knitted"; and it is emphasized that Cohn testified that the accused machine was not adapted to the extreme overspreading of cloth.

The specification of patent '528, however, immediately after the quoted passage, goes on to say "and simultaneously feeding the tubular fabric lengthwise with sufficient lengthwise freedom to permit such widthwise expansion of the fabric without subjecting it to any appreciable lengthwise tension." The novelty lies mainly in the step, described in the last quoted words, which Cohn, following Redman, found to be essential. The evidence shows that Cohn himself employed substantial widthwise stretching and the advertisements of the Tubular Corporation, in extolling the merits of its machine, shows that overspreading is used by most mills to control the lengthwise shrinkage. The point is of little moment in any event, for infringe-

ment would not be avoided merely by showing that the widthwise stretching of the material by the accused machine is not so great as that indicated by the Redman patent.

Affirmed.