David H. KEISER, Jr., d/b/a The Keiser Manufacturing Company, Appellee,

v.

HIGH POINT HARDWARE COMPANY, Appellant.

No. 8562.

United States Court of Appeals Fourth Circuit.

Argued March 29, 1962.

Decided June 13, 1962.

J. Helen Slough, Cleveland, Ohio (Horace S. Haworth, High Point, N. C., on brief), for appellant.

Austin R. Miller, Philadelphia, Pa. (Sapp & Sapp, Armistead W. Sapp, Greensboro, N. C., and Paul & Paul, Philadelphia, Pa., on brief), for appellee.

Before HAYNSWORTH, BRYAN and BELL, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge.

A patent—its validity and infringement—is the subject of this appeal, and is best described in the summary of the District Judge:

"The patent in suit relates to grass shears or hedge shears which are characterized by a pivotal connection involving a pair of pivots, one of which forms a bearing for the horizontal opening and closing shearing movement of the blades, and the other of which is a separate transverse pivot and forms a bearing for one of the blades to swing independently at

right angles to its shearing movement. Prior to World War II, various shears had been utilized for the purpose of cutting grass and hedges, most of these shears having a pair of movable blades bolted tightly together by a single nut and screw. Such shears were not only difficult to operate but also were subject to excessive wear from the grinding action of the blades."

It is Patent No. 2,407,237, issued September 10, 1946 to David Howard Keiser, Jr., who successfully sued below to restrain its infringement in retail sale by the defendant-appellant High Point Hardware Company of High Point, North Carolina. True Temper Corporation of Cleveland, Ohio manufactured and distributed the suspect shear. Although never directly brought into the case, the District Court declared its decree binding upon True Temper as well as High Point, upon a finding that True Temper was defending the suit in High Point's name.

The patent is invalid, we hold, as generally anticipated in the prior art, and because the improvement claimed lacks inventiveness. Neither the infringement nor the answerability of True Temper is reached here in view of this conclusion.

This patent represents at least the second effort of Keiser to remedy the disadvantages of hard operation and excessive wear found in prior shears. The history of Keiser's endeavors was recounted by the District Court as follows:

"The plaintiff himself introduced an easier-working pair of shears which he produced under his patent No. 2,281,977, granted May 5, 1942. The easy-working qualities of these shears were obtained by mounting the blades very loosely on a single pivot which would allow some vertical tilting to the blades which served to alleviate the tight or grinding action of the blades. But shears manufactured under that patent possessed disadvantages, including excessive wear at the pivot bearings because of the loose fit, difficulty and high cost of assembly at the plant because of the need of skilled labor to make the adjustment at the pivot, and commercial unattractiveness due to the loose and 'sloppy' fit of the blades.

"The plaintiff, under the patent in suit, overcame these difficulties by embodying the use of twin-pivots, mounted transversely to each other * * *."

This success, Keiser concedes, is found entirely in claim 6 of the patent, and he acknowledges further that unless this claim be sustained his suit must fail. Claim 6 reads:

"A pivotal connection for a pair of shear blades comprising a pivot forming a bearing for a cooperative flat-wise opening and closing movements of said blades, and a separate transverse pivot forming a bearing for one of said blades for independent swing thereof at right angles to its shearing movement."

The pith of the claim is the provision of a transverse or horizontal pivot, which allows potential vertical displacement by the upper blade in addition to its "flat-wise opening and closing movements." An "independent swing at right angles to its shearing movement" is thus achieved. The primary function claimed for this feature is to allow the blades to close and release more easily, avoid clogging and minimize wear from friction, while at the same time assuring cutting effectiveness.

Some provision for vertical motion of the upper (movable) blade towards and from the lower (fixed) blade has been known and used in the prior art of shear manufacture since well before 1935, when it appeared in the "Level-Cut" shears of Keiser (a design never patented by him). For example, Ginnel Patent No. 1,562,-630, issued November 23, 1925, and Simonsen et al. Patent No. 1,987,375, issued January 8, 1935, both sponsored shears which allowed a vertical yielding action. The tolerance found in Ginnel and Simonsen was not explicitly directed to all the

aims now expressed by Keiser—Simonsen had in mind specifically a means of passing between the blades an obstructing object. But the "Level-Cut" is conspicuous in its employment of this feature for the very purposes the patentee now contemplates.

True, the vertical movement was not achieved, as in the present patent, by use of a special and independent pivot bearing. Nevertheless the identical principle was adopted and utilized, though less formally embodied in the prior art shears. In the instances mentioned, in general the pivoting for the vertical action was provided by the heel of the movable blade acting as a fulcrum. The amount of this permissible working was determined by the degree of tension supplied by the nut capping the upright post and holding the upper blade in place.

The feature of vertical yielding was included in Keiser's first patent, No. 2,281,977 issued May 5, 1942. Emphasized, it appears in the following description of the shears taken from those letters:

"* * * shears having a fixed blade and a movable blade, a nonbinding pivotal connection for said blades comprising a spacing boss and vertical pivot post on the fixed blade, a pivot ear for the movable blade spaced above the horizontal plane of the latter and *having a relatively loose unclamped fit on said pivot post*, and an operating arm for said movable blade extending laterally therefrom in the horizontal plane of said blade and acting to cant said pivot ear so as to tilt the cutting edge of said movable blade in one direction during blade closing together movements, and in a reverse direction during blade opening movements."

The major advance in this arrangement —Keiser's first patent—was the use of a high vertical pivotal post. The foremost advantage was to allow the pull on the upper blade, as the shears were actuated, to be applied at a point in a plane well below the pivoting point—the fulcrum—for the upper blade. This imparted a downward pull to the upper blade upon closing, tilting it on its loose bearing toward the lower blade edge. This disposition of the parts assured proper engagement of the blades and otherwise increased the shears' efficiency. That a vertical movement was permitted by the "loose unclamped fit [of the upper blade] on said pivot post * * *" was confirmed by Keiser at trial.

This loose fit was effected by having the circumference of the post somewhat smaller than that of the hole in the upper blade through which the post passed. To prevent jamming of the blade or excessive freedom of the cutting edge, the tension on the nut atop the post had to be carefully adjusted upon assembly. As Keiser himself described it, "Well, yes, a shear like that had to be set just so." Again, he observed "[E]verything had to be tied together to fit the looseness of the hole; they were hard to set and that was it." Of course, the connection was also laterally wobbly.

Correction of these defects and enhancement of the vertical movement, while preserving all the advantages of the first patent, were the aims of the patent in suit, Keiser's second. The latter, No. 2,407,237, quite candidly recites that it "relates generally to shears, and more specifically to improvements particularly applicable to the type of shears shown in my prior Patent No. 2,281,977 of May 5, 1942." Concern for excessive vertical expansion—as that possibility existed in "Level-Cut"—was met by the downward pull on the movable blade as that action was incorporated in Keiser's first patent.

The correction consists merely of placing a yoke over the vertical pivot post and swinging the upper blade from the yoke on a horizontal transverse pivot-bearing built into the yoke. Flat-wise movement of the upper blade is effected through the yoke which rotates on the vertical post during shearing. The vertical play of the upper blade, now hinged

to the yoke, is controlled by a spiral spring which acts to keep the blades in contact. The result is that the blades operate essentially the same as they did before, except that the vertical potentiality is achieved through a precision bearing rather than a "loose" or "sloppy" jointure of the blades. Objectionable looseness of the previous patent was thereby abolished, and special skill in assembly was no longer required.

But this improvement is not, in our opinion, invention. It is merely another way of effectuating the desirable and oftseen vertical movement. It comprises only the installation of a well known kind of bearing and a change of the bearing location. We do not think the improvement was anything more than "would have been obvious at the time the invention was made to a person having ordinary skill in the art" of making shears. 35 U.S.C. § 103.

Various other aspects of the patent in suit—such as market success of the device and its imitation by others— are urged by the patentee in support of his claim of inventiveness. These— among other things—are indicia of invention, though alone they do not ex proprio vigore establish patentability. Triumph Hosiery Mills, Inc. v. Alamance Industries, Inc., 299 F.2d 793, 800 (4 Cir., 1962). Particularly is this so when proof of the indicators is, as here, less than solid. For example, the prior art devices also enjoyed commercial success. This suggests that something other than novelty—such as general need and use for such a tool—may have prompted the alleged demand for the article made under the instant patent.

In our conclusion we have not overlooked the presumption of validity incident to the grant of a patent, nor the burden of a questioner to prove his doubts. 35 U.S.C. § 282; see Universal, Inc. v. Kay Mfg. Corp., 301 F.2d 140, 141 (4 Cir. 1962). The defendant High Point Hardware has adequately established both that the patent in suit had been anticipated in regard to the vertical movement by the prior art and that the improvement on No. 2,281,977 did not constitute invention.

The order of the District Court will be reversed and the action dismissed.

Reversed and dismissed.