## ESCO CORPORATION
### v.
## TRU–ROL COMPANY, INC.
### Civ. No. 71–912–M

United States District Court,
D. Maryland.
Dec. 11, 1972.
As Modified Dec. 21, 1972.

See also, 5 Cir., 386 F.2d 442.

---

1. Even this requirement has been called into question. See Lober v. Moore, 135 U.S.

App.D.C. 146, 149, 417 F.2d 714, 717 (1969), and cases cited therein.

418

Jerome F. Fallon and Dawson, Tilton, Fallon & Lungmus, Chicago, Ill., and Benjamin C. Howard and Miles & Stockbridge, Baltimore, Md., for plaintiff.

Patrick J. B. Donnelly and Niles, Barton & Wilmer, Baltimore, Md., and George H. Spencer and Spencer & Kaye, Washington, D. C., for defendant.

JAMES R. MILLER, Jr., District Judge.

This is an action for infringement of U. S. Patent No. 2,919,506, which was issued on January 5, 1960, and is owned by the plaintiff, Esco Corporation.[1] The patent in suit relates to excavating teeth and base supports therefor of the type used on power-driven equipment such as excavating and loading buckets, dippers, scoops and scarifiers. The base supports, known in the trade as adapters, are bolted to the power-driven equipment, and the teeth, also known in the trade as points, are detachably connected to the adapters.[2] The defendant, the Tru-Rol Company, Inc., is charged with infringement by sales of tooth points, adapters and combinations thereof covered by the patent in suit. Defendant denies that the points and adapters it sells are covered by the patent in suit.

Jurisdiction exists under 35 U.S.C. § 281 and 28 U.S.C. § 1338. Venue has been admitted.[3]

The plaintiff is a corporation organized and existing under the laws of the State of Oregon and has its principal place of business in Portland, Oregon. The defendant is a corporation organized and existing under the laws of Maryland and has its principal place of business in Baltimore, Maryland.

In the most common application of the use of excavating teeth, the adapter is secured to the leading edge of a power-driven bucket and a replaceable point secured to the adapter by means of a removable locking pin. Without these penetrating teeth, generally wedge-shaped, the leading edge of the bucket would have to withstand the shock of encountering rocks and other hard substances. The digging action is performed by the tooth assembly while at the same time the leading edge of the bucket is spared the shock of initial contact with the rocks or other materials with which the equipment is working. Expensive and time-consuming repairs to the bucket are thereby eliminated and instead the problem becomes one of merely replacing or renewing the digging projections themselves. Through the use of two-part excavating teeth, it is possible to renew the digging projection by the introduction of a new point as contrasted to the entire tooth, thereby saving substantial time and metal.

In the type of adapter and point commonly used prior to the invention of the patent in suit, the adapter and point had angularly related flat surfaces. More particularly, most two-piece excavating teeth had a wedge-shaped projection or nose on the adapter with a correspondingly-shaped socket in the rear of the wear point. The flat surfaces of the

1. Pretrial order, ¶ 2.

2. The term "excavating tooth" also is sometimes used to denote the entire wedge-shaped projection, consisting of the adapter and the point.

3. Pretrial order, § 1.

wedge-shaped adapter and point were the bearing surfaces at which the two parts came in contact. Under some operating conditions, lateral pressure on the tooth caused sideways movement producing a pivoting or swinging action between the adapter and point. This reduced the fitting contact or bearing between the two parts to a small limited area, resulting in localized and greatly increased stress on the point and nose in that area. Under these conditions the nose and point were subject to rapid distortion and wear and often broke under the concentrated pressure. In order to prevent this phenomenon, there was need for the nose and point members to have surfaces which maintained the bearing contact constant during lateral movement of one of the members with respect to the other.

The invention of the patent in suit departs from the flat angular contacting nose and point socket surfaces and uses instead convergent surfaces of revolution having a common vertical axis near the rear of the point. The surfaces of the invention of the patent in suit, colloquially called "conical," enable the parts to move relative to each other with the bearing surfaces of the two members maintaining substantially constant the bearing realized before the application of lateral stress. The main feature of all the claims of the patent in suit is that the upper and lower bearing surfaces of the point or adapter, or both, have surfaces of revolution generated about a vertically-extending axis.

The specification of the patent describes that it is an object of the invention to provide a nose support and socket element in the nature of a point or cap or sleeve mounted on said nose whereby under impact the element may swing to a limited extent laterally while providing full bearing or surface contact between the parts throughout such lateral movement. Another object is to provide an excavating device in which cooperating nose and socket elements have surfaces which remain in contact during lateral movement of one of the members with respect to the other, while at the same time providing a sturdy interlock between the members. A still further object is to provide a combination of nose and socket elements united by keys or other means whereby the parts may swing relative to each other to a limited extent while at the same time providing wide areas of contact between the members during each portion of such travel so that a large bearing surface is provided between the members under heavy load and irrespective of the relative position of the two members. Yet another object is to provide in excavating devices, nose and socket elements wherein the nose is provided with a cone surface or other surface of revolution contacting a corresponding surface of the socket element, thus enabling the parts to move in an arc relative to each other with the bearing surfaces of the two members substantially in full contact. It is a purpose of the cooperating nose and socket structure shown herein to support fully the point upon the nose in such lateral swinging movements so that point contact or point wear is substantially obviated. This structure avoids point contact and wear, and by maintaining the bearing surfaces in contact over wide areas during the movements of the parts, a long-wearing point or socket element is provided.

Esco Corporation manufactures and sells excavating teeth with surfaces of revolution as provided by the invention of the patent in suit and has enjoyed substantial commercial success with such teeth. Such teeth have resulted in longer life, smaller size for equivalent work and less breakage. Caterpillar Tractor Company, Clark Equipment Company and International Harvester Company, well known manufacturers of excavating equipment, utilize the patented teeth. Esco in connection with the patented teeth received the 1962 Mining World Award for "Achievement in equipment development aiding the technological advancement of the mining industry." Esco markets teeth made with "conical" bearing surfaces according to the inven-

tion of the patent in suit. These surfaces of revolution are those resulting from revolving a broken or bent line about an axis of revolution.

Although the defense of invalidity of the patent was interposed in the Answer and First Counterclaim, this defense was abandoned when two weeks prior to the trial the defendant moved to amend its Answer and First Counterclaim and the court subsequently allowed the amendment. The patent in suit has previously been litigated and found valid. See Hensley Equipment Company v. Esco Corporation, 383 F.2d 252 (5th Cir. 1967), modified on rehearing, 386 F.2d 442 (5th Cir. 1967).

The claims of the patent in suit asserted to be infringed are Claims 1, 3, 8, 15, 20, 21 and 28. Claims 1 and 3 are directed to the combination of the point and adapter while claims 8, 20 and 28 are directed to the point *per se*. Claims 15 and 21 are directed to the adapter *per se*.

Of the claims directed to the combination, claim 3 can be taken as representative. Claim 3 reads, when separated into its various mechanical elements, as follows:

"A supporting structure for an excavating tooth, and the like, subject to stresses tending to produce sideways movement, comprising

(1) a tapered nose member having

(2) a socket member receiving said nose member and having

(3) corresponding confronting upper and lower interior bearing surfaces fitting said nose surfaces, said bearing surfaces being surfaces of revolution generated by converging lines revolved about a substantially vertical axis through said members at a distance from said end of the nose and

(4) upper and lower exterior bearing surfaces converging toward the end of the nose member, and

(5) means interconnecting said members for relative rotative movement of one of said members about said axis, whereby said bearing surfaces remain in fitting contact during such movement." (PX40).

Of the claims directed to the point *per se*, claim 8 can be considered representative and, when separated into its various mechanical elements, reads as follows:

"A replaceable excavating tooth point, comprising

(1) a spike portion integral with and projecting forwardly from

(2) a supporting portion, said supporting portion having

(3) top and bottom bearing surfaces adapted to engage longitudinally-extending top and bottom bearing surfaces on a tooth point support,

(3A) said bearing surfaces on said tooth point being generally convergent in a direction longitudinally of the tooth point, and

(3B) said bearing surfaces being surfaces of revolution having a common axis of generation adjacent the rear extremity of said supporting portion and extending in an approximately vertical direction with respect to said top and bottom surfaces." (PX41).

Of the claims directed to the adapter *per se*, claim 15 can be taken as representative. Claim 15 when separated into its various mechanical elements, reads as follows:

"An adapter for supporting a replaceable excavating tooth point projecting forwardly therefrom, said adapter having

(1) top and bottom bearing surfaces adapted to engage longitudinally-extending top and bottom bearing surfaces on the tooth point, said bearing surfaces being generally convergent in their longitudinal direction, said bearing surfaces being surfaces of revolution having

(2) a common axis of generation adjacent a rearward portion thereof, said axis of generation extending in an approximately vertical direction

with respect to said top and bottom surfaces." (PX43).

Defendant markets points having designations ZC 001, ZC 216, ZC 302, ZC 362, and ZI 401 along with adapters ZC 002 and ZC 361.

It has been admitted [4] that the defendant's tooth parts are interchangeable with Esco parts according to the following schedule:

ZC 001 point interchanges with 6K6936

ZC 002 adapter interchanges with 6K3125

ZC 216 point interchanges with 5K2925

ZC 302 point interchanges with 4K6148

ZC 361 adapter interchanges with 4K3960

ZC 362 point interchanges with 4K34

ZI 401 point interchanges with 25

The court viewed demonstrations of the satisfactory fit of defendant's tooth parts when gauged by Esco's shop fitting masters. In order to pass this test (1) without rocking on the nose of the shop fitting master and (2) without sliding on the nose in such a fashion that the key holes of the point and the test master would not be aligned, the point socket had to be substantially the reverse of the conical test master nose.

A differentiating characteristic of the upper and lower bearing surfaces of the tooth parts marketed by defendants from those marketed by plaintiff (with the exception of the ZC 361 adapter) is the presence in the defendant's tooth parts of grooves extending generally longitudinally in the central portions of the upper and lower bearing surfaces. Although the manufacturer of defendant's tooth parts, Tractortecnic Gebruder Kulenkampff & Company of Gevelsburg, West Germany, had prior to the institution of this suit been manufacturing and selling tooth parts, particularly the ZC 362 points, without the aforesaid grooves, it ceased manufacture of ungrooved ZC 362 points to avoid any question of infringement of plaintiff's German Patent No. 1,255,595.[5] Claim 1 of German Patent No. 1,255,595 reads as follows:

"Excavating tooth wherein the tooth body which carries an exchangeable tooth tip has a wedge-shaped projection which extends into a recess of the tooth tip which recess is adapted to the wedge-shape of the projection and wherein the tooth tip is secured to the projection of the tooth body by means of a securing pin which is inserted into a recess which extends substantially vertically through the projection and tooth tip and is adapted to the shape of the securing pin, with at least one of the two wedge surfaces of the projection being circularly arched in a plane which is parallel to the cutting edge of the tooth tip, characterized in that the wedge-shape configured projection (18) of the tooth body (b) is fashioned as a part (43) of a body of rotation (4) which rotates about a vertical axis and that the securing pin (27) which serves to secure the tooth point (C) is so arranged that its longitudinal axis and the axis of the body of rotation (4) coincide at least approximately."

It has been admitted by defendant that German Patent No. 1,255,595 is the counterpart of the patent in suit.[6]

The defendant contends that its tooth parts do not have bearing surfaces which are surfaces of revolution having an axis extending vertically with respect to the bearing surfaces. In addition, the defendant contends that, even if the bearing surfaces of its tooth parts were surfaces of revolution as described, infringement is avoided because these bearing surfaces, due to the presence of the grooves, do not provide the full bearing contact of the embodiment of the in-

---

4. Pretrial order, Schedule "C", ¶ 4.

5. Pretrial order, Schedule "C", ¶ 10.

6. Pretrial order, Schedule "C", ¶¶ 8–9.

vention illustrated in the patent in suit. The defendant has admitted that it knows of no problems of operability arising out of the use of its points on Esco adapters corresponding to the defendant's adapters.[7] Defendant makes no challenge as to the presence of the other mechanical elements of the claims in the accused structures and the court finds that each of these other mechanical elements has a response in the accused structures.

On the issue of the nature and character of the bearing surfaces in defendant's tooth parts, plaintiff introduced the testimony and measurements of its expert, Clarence T. Fishleigh.[8] Mr. Fishleigh's measurements first consisted of locating a proposed axis of revolution on the bearing surface of each of defendant's points and adapters. The proposed axis of revolution was taken at a distance of about ⅜″ rearward of the rear part of the locking pin-receiving opening, this being the axis of revolution utilized in the interchangeable Esco parts as shown on Esco Drawing CE–9925 (PX13D). Utilizing this point as an origin, a series of radial lines were inscribed on each bearing surface as were a series of concentric arcs intersecting the radial lines. This provided a number of sets of points with the points in each set being equidistant from the axis of revolution. Measurement of the height of each of these points relative to a predetermined plane was made and the results tabulated and thereafter presented graphically in enlarged chart form.

It is a basic principle of geometry that, when dealing with a surface of revolution (i. e., a conical surface) all of the points on the surface which are the same distance from the axis of revolution will be at the same height above a base plane perpendicular to the axis of revolution. Accordingly, if measurements are made of the height above such a plane for a series of points located on a radial line on the surface at predetermined distances from the axis of revolution, and plotted, that plotted line will be coincident with or superimposed upon similar plotted lines for similar measurements made on any other radial line on the cone. (Tr. 221–4, 224–5, PX6A). The measurements of Mr. Fishleigh, as reflected in the various plots, adhered to this principle, when experimental error and manufacturing tolerances are taken into account.

The defendant's accused parts are castings and are not machine finished parts. A motion picture was introduced by the plaintiff, together with the testimony of a registered professional engineer in the employ of Esco, to demonstrate the steps followed in the casting of metal parts. It is clear that fine dimensional control is impossible for either the defendant's accused parts or the plaintiff's. In fact, tooth parts of the same batch may differ in dimension because of differences in cooling rates.

Mr. Fishleigh concluded from his measurements and tests that the bearing surfaces of all of the defendant's accused parts were surfaces of revolution whose axis of revolution was vertical to the plane formed by the revolution of the generatrix.

---

7. Pretrial order, Schedule "C", ¶ 6.

8. Clarence T. Fishleigh is a consulting engineer registered as a professional engineer in the States of Illinois, Michigan, Ohio, and New York among others. He received a Bachelor of Science degree in Electrical Engineering from the University of Michigan in 1917 and is licensed to practice law in Illinois and Michigan. Mr. Fishleigh has done engineering consulting work for a number of large industrial firms and universities and has given expert testimony in patent suits through-out the country. He is a member of the National Society of Professional Engineers, the Ohio and Illinois Societies of Professional Engineers, the Western Society of Engineers in Chicago, the American Society of Mechanical Engineers, and the Society of Automotive Engineers. In addition, he is generally familiar with the devices that are the subject of this suit, having seen them used in iron mines, rock quarries, and other operations in various places in the United States. He has also made a study of the patent in suit and the prior art related thereto.

John S. Hubacher[9] testified as the expert for defendant. Mr. Hubacher made measurements only on defendant's ZC 002 adapter, notwithstanding the fact that defendant sells very few adapters as opposed to points. Because of the grooves, the bearing surfaces on the ZC 002 adapter were not only the smallest in the absolute sense but also constituted the surfaces which were the smallest percent of the potential bearing surface. The selection of the ZC 002 adapter as the sole accused part to examine was the most favorable selection possible to the defendant since the smaller the bearing surface, the more difficult it is to determine visually whether such a surface is a surface of revolution.

Mr. Hubacher's measurements consisted of locating a number of points at spaced longitudinal distances along a plurality of laterally spaced longitudinally extending lines on the two upper bearing surfaces on either side of the groove of the ZC 002 adapter. The height of these points relative to the mid-plane of the adapter, i. e., the plane which was equidistant between the upper and lower bearing surfaces, was then ascertained and tabulated. From these tabulations a magnified scale model (DX 32) was constructed. The model had a wood frame overlayed with plaster of paris and was sculptured to correspond to the accused adapter ZC 002. It was admitted by defendant's expert Hubacher that any deviations in the original from a surface of revolution would be magnified in the model and that this was favorable to the defendant. It was also admitted that the magnification utilized in the graphs of plaintiff for the purpose of making a clear visual presentation was unfavorable to the plaintiff.[10]

The model had a magnification of five times and demonstrations were made to the court utilizing various selected proposed axes of revolution. In each of the demonstrations, the defendant's expert, Hubacher, mounted a pivot arm and stylus at the selected axis and swung the stylus, noting the contact or lack of contact thereof with the bearing surfaces on the magnified model. In no instance were both bearing surfaces scribed by a single swinging of the stylus. This demonstration purported to prove the absence of surfaces of revolution in the accused adapter ZC 002.

Mr. Hubacher admitted that his demonstration would not be probative on the issue of whether or not a surface of revolution was present if his pivot were inclined. He also admitted that, also assuming the bearing surfaces to be surfaces of revolution, his demonstrations would not be probative on the issue if he had in fact selected as a pivot axis one which did not coincide with the actual axis of revolution.[11] For the pivot axis, Mr. Hubacher chose one point which was at the rear of the locking pin-receiving opening and another which was $4\frac{1}{4}''$ rearward of that. No pivot axis closer to the rear of the locking pin-receiving opening than $4\frac{1}{4}''$ was demonstrated. In particular, no demonstration was made with a pivot axis $1\frac{7}{8}''$ rearward of the locking pin-receiving opening. Such a pivot axis would correspond to the location selected by Mr. Fishleigh, being five times (corresponding to the scale of the model) the $\frac{3}{8}''$ spacing employed in the Esco tooth parts. According to Mr.

---

9. John S. Hubacher received a Bachelor of Science degree in Mechanical Engineering from the Carnegie Institute of Technology in 1962 and has received subsequent training at George Washington University and the University of Virginia College for Continuing Education. He has served in various engineering and managerial capacities for Atlantic Research Corporation and General Technology Corporation and has been involved with the design of mechanical hardware and systems for military and space applications, and the manufacture of exotic materials. Since 1969 he has been employed by Value Engineering Company as Assistant Laboratory Director and has been involved in the development and testing of material handling equipment for the Army Corps of Engineers.

10. Tr. 615–616.

11. Tr. 623–624.

Hubacher, even where the stylus did not scribe both surfaces, the stylus came in "close proximity." [12] When the magnification is taken into account, the amount by which the stylus missed was almost of the order of magnitude of the manufacturing tolerance and experimental error.[13]

Initially, Mr. Hubacher stated that he could not characterize the defendant's bearing surfaces as having any particular geometric name applicable to them. Later, he stated that the surfaces were flat, at least within 0.020″. This later statement was contradicted by defendant's own data which, when plotted (PX 97), revealed definite curvature.

In rebuttal, plaintiff presented plots and charts, prepared and explained by Mr. Fishleigh, utilizing the measurement of defendant's expert Hubacher relative to the ZC 002 adapter which demonstrated to the court that defendant's own measurements established that the bearing surfaces in question were indeed surfaces of revolution as specified.[14]

From all the evidence the court finds as a fact that the bearing surfaces of defendant's adapters ZC 002, and ZC 361 are surfaces of revolution as specified in the patent claims. Similarly the court finds as a fact that defendant's points ZC 001, ZC 216, ZC 302, ZC 362 and ZC 401 each has upper and lower bearing surfaces which are surfaces of revolution generated about a vertical axis of revolution located adjacent the rear of the point.

The defendant argues, however, that the grooves in the defendant's accused points and adapters so differentiate them from the invention of the patent in suit as to make them non-infringing even if the bearing surfaces or rails on either side of the grooves are in fact surfaces of revolution as described in the patent in suit. In fact, Mr. Hubacher testified, as is obvious, that the sole function of the groove in the respective points and ZC 002 adapter is to interrupt the bearing surface in an attempt to avoid the patent in suit. There is no advantage to the grooves, but instead there is the disadvantage of interruption of the bearing surfaces so that the total potential bearing surfaces of the point socket and adapter nose are not in constant contact with each other.[15]

Of the defendant's accused grooved tooth parts, the smallest size includes the ZC 001 point and ZC 002 adapter. As the point size gets larger, the bearing areas increase relative to the size of the groove. Since the ZC 361 adapter has no grooves, there is only one adapter, the ZC 002, which is equipped with grooves in the bearing surfaces. In the ZC 002 adapter, the width of the bearing surfaces is approximately 0.53″ out of a total available bearing surface of 1.125″. Thus, the bearing surfaces in the ZC 002 adapter constitute somewhat less than 50% of the bearing surface available if the groove had not been present. The actual bearing surface in the ZC 001 point is somewhat greater a percentage of the bearing surface available if the point had not been grooved.

Even though the grooves prevent the total potential bearing surfaces from being in fitting contact, the rails (which are surfaces of revolution) still pivot about the axis of revolution. Those surfaces which are bearing, i. e., the rails in the accused grooved tooth parts, remain in fitting contact upon pivoting or swinging movement in a lateral direction. In the court's view the claims of the patent in suit are not limited to surfaces of revolution which are continuous and extend uninterrupted from one side

---

12. Tr. 570.

13. Tr. 617.

14. See PX 96–99.

15. Of course, as was pointed out during the trial, in this less than perfect world it would be impossible to manufacture points and corresponding adapters to such true tolerances as to allow the full bearing surfaces to be perfectly in constant contact. At best one could achieve only substantially total and constant contact.

to the other of the socket or nose, as the case may be.

Notwithstanding the fact that the bearing surfaces in defendant's tooth parts are reduced in area relative to the corresponding Esco parts, the remaining bearing surfaces still produce the advantages of the invention of the patent in suit. Specifically, the remaining bearing surfaces, which are surfaces of revolution as specified, permit the maintenance of a substantially constant bearing upon lateral movement of the point on the adapter. The court is cognizant of the fact that there is a slight reduction in bearing area in the single instance where the defendant's grooved point ZC 001 is used in conjunction with the defendant's grooved adapter ZC 002, but even in this instance the surfaces of revolution which are in contact with each other operate in substantially the same way to produce substantially the same result (such as longer life) as that of the Esco point and adapter which is constructed according to the claims of the patent in suit.

The court finds that the defendant's grooved tooth parts are merely impaired or less efficient versions of the structure of the patent in suit (Tr. 613–614). If the defendant's constructions can withstand the initial stress (Tr. 408–409), the effective bearing surfaces come into play to produce the advantages of the patent in suit. In the defendant's grooved tooth parts, because of the lower amount of bearing surface, it is even more important to use the invention of the patent in suit in order to allow the constant and even distribution of the load over the reduced bearing area. An analogy can be drawn between the defendant's impaired versions of the patented invention and a wheel which has been impaired by cutting off small arcs along tangents—the result of free rolling is imperfectly achieved but it is still better than pulling a completely flat surface.

 Some point has been made by the defendant that claims 1, 3, 8, 15, 20, 21 and 28 of the patent in suit may be read to require that the axis of revolution be perpendicular to the generatrix rather than to the plane formed by the series of points equidistant along the generatrix as it revolves about the axis. The latter interpretation conforms to Figures 4 and 6 of the patent in suit and would allow the scribing of a cone such as is referred to in the patent in suit. The former interpretation would result in a configuration and structure totally unlike the one described in the specification and illustrative drawings of the patent in suit. While the claims of a patent limit the invention and the specification cannot be utilized to expand the patent monopoly, claims are to be construed in the light of the specification and both are read with a view to ascertaining the invention. United States v. Adams, 383 U.S. 39, 49, 86 S. Ct. 708, 15 L.Ed.2d 572 (1966); Seymour v. Osborne, 11 Wall. 516, 547, 78 U.S. 516, 20 L.Ed. 33 (1871). Where a claim is fairly susceptible of two constructions, a court must adopt, and this court hereby does adopt, the one which will secure the invention rather than the one fatal to the grant. Walker on Patents, 2d ed., Vol. 4, § 246.

 As indicated earlier, the defendant does not actively contest the validity of the patent in suit. Under 35 U.S.C. § 282 the patent in suit is presumed to be valid in the absence of clear and convincing evidence to the contrary. Mumm v. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983 (1936); Porter-Cable Machine Co. v. Black and Decker Co., 274 F.Supp. 905, 913 (D.Md. 1967), aff'd, 402 F.2d 517 (4th Cir. 1968), cert. denied, 393 U.S. 1063, 89 S. Ct. 716, 21 L.Ed.2d 706 (1969); Patterson-Ballagh Corp. v. Moss, 201 F.2d 403, 406 (9th Cir. 1953). The statutory presumption of validity, created by the action of the Patent Office in the exercise of its expertise in issuing the patent, is strengthened by the upholding of the validity of the patent by another court. Ransburg Electro-Coating Corp. v. Proctor Electric Co., 203 F.Supp. 235, 243

(D.Md.1962), aff'd, 317 F.2d 302 (4th Cir. 1963). As previously noted, the patent in suit has been declared valid by the United States District Court for the Northern District of Texas in Esco Corporation v. Hensley Equipment Co., Inc., 251 F.Supp. 631 (N.D.Tex.1966), rev'd on other grounds, 383 F.2d 252, modified on rehearing, 386 F.2d 442 (5th Cir. 1967). In the absence of compelling evidence to the contrary this court finds claims 1, 3, 8, 15, 20, 21, and 28 are good and valid in law.

■ In determining whether or not infringement exists, the court first looks to the claims in suit and a comparative analysis claim-by-claim, element-by-element, matching the patent against the accused device is helpful. Bryan v. Sid W. Richardson, Inc., 254 F.2d 191, 196 (5th Cir. 1958), cert. denied, 358 U.S. 815, 79 S.Ct. 22, 3 L.Ed.2d 57 (1958). In order to infringe, the accused device must have substantial identity of structure, operation, and result with the invention claimed. Bryan v. Sid W. Richardson, Inc., *supra,* at p. 197; Ortman v. Maass, 391 F.2d 677, 682 (7th Cir. 1968); McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d 381, 401 (10th Cir. 1965), cert. denied, 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966). A close copy which seeks to use the substance of the invention and, although showing some change in form and position, uses substantially the same devices, performing precisely the same offices with no change in principle, constitutes an infringement. Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 74 L.Ed 147 (1929).

■ Imperfect utilization of the patent with the hope of evading infringement while enjoying the benefits of the teaching of the patent constitutes infringement. Infringement is present in a device even when it does not realize fully the best mode of practicing the invention. Impairment of function and lessening of result in degree does not avoid infringement. Stedman Manufacturing Co. v. Redman, 257 F.2d 867, 873–874 (4th Cir. 1958), cert. denied, 358 U.S. 928, 78 S.Ct. 314, 3 L.Ed.2d 302 (1959); Admiral Corp. v. Zenith Radio Corp., 296 F.2d 708, 717 (10th Cir. 1961); Blohm & Voss A.G. v. Prudential-Grace Lines, Inc., 346 F.Supp. 1116, 1145–1146 (D.Md.1972).

■ This court concludes that the defendant through its sale of points and adapters with surfaces of revolution generated about axes of revolution located adjacent the rear of the tooth, has infringed the claims of Patent 2,919,506 as follows: that each of defendant's points ZC 001, ZC 216, ZC 302, ZC 362, and ZI 401 infringes claims 8, 20, and 28; each of defendant's adapters ZC 002 and ZC 361 infringes claims 15 and 21; and that each combination of the foregoing points and adapters infringes claims 1 and 3.

Turning now to the relief sought by the plaintiff, the court must consider plaintiff's request that it be determined to be entitled to treble damages under 35 U.S.C. § 284 and to an award of attorney fees under 35 U.S.C. § 285.

As to the former question, the court will decline decision at this time. At this juncture, the court notes that pretrial conferences resulted in a determination to bifurcate the trial with the issues of liability to be tried first and the issue of damages to be tried later. In this court's view the circumstances of this case, as presently known to the court, do not make it appropriate for the issue of liability for treble damages to be decided without relationship to the amount of actual damages sustained by plaintiff. If the parties are able to agree and stipulate on the amount of the damages including any punitive damages in light of the findings of the court as set forth in this opinion, it will not be necessary for the court to decide the matter. If the parties are unable within 60 days of this date to agree on the amount of the damages, then upon being notified of that fact the court will schedule further proceedings to determine and assess damages.

As to the latter question, the court believes that this is an "exceptional" case, within the meaning of § 285, and that reasonable attorney fees should be allowed to plaintiff. In reaching this conclusion the court has considered a number of facts which it finds to have been established or admitted.

Firstly, the defendant has abdicated any control over the suit. It has been admitted by defendant that Tractortecnic, the manufacturer of the accused teeth, has paid or undertaken to pay all legal fees billed in connection with the defense of this lawsuit and has undertaken to indemnify defendant and save defendant harmless from any and all expenses, (legal or otherwise), costs, damages (including any award of plaintiff's attorneys fees) that may be awarded or assessed against defendant in this litigation.[16] Tractortecnic has selected trial counsel, Mr. Spencer. The defendant's president, Mr. Gurley, who handles the business affairs of Tru-Rol, had never seen the Answer and Counterclaim filed in this case up to the time of his deposition in December, 1971 nor discussed them with anyone. He had no familiarity with the technical engineering questions involved in the determination of whether or not the accused devices were substantially identical in structure, operation, and result with the invention of the patent in suit and he apparently relied entirely upon Tractortecnic to produce whatever data and expert opinion would be relied upon to substantiate the defenses and counterclaims which were advanced in this court in the name of Tru-Rol. As Mr. Gurley said in his deposition, "I don't tell anybody what to do regarding this [suit] . . . So, theoretically to me you are suing Tractortecnic, not really me."[17] Having abdicated control over the lawsuit, the defendant is responsible for the actions nevertheless of those who did control the defense in the name of Tru-Rol.

Secondly, in the face of prior litigation in another court which had determined the validity of the patent in suit, Esco Corporation v. Hensley Equipment Company, *supra*, the defendant had filed in its name an Answer and Counterclaim asserting the invalidity of the patent in suit, and then immediately before this trial withdrew the claim of invalidity.

Thirdly, in response to Interrogatories 17 and 21 filed by plaintiff to attempt to learn the reason for the introduction of the grooves by Tractortecnic onto the potential bearing surfaces of the accused excavating teeth, certainly a crucial question in light of what later turned out to be the testimony of Mr. Hubacher that the sole reason for the grooves was to interrupt the surfaces of revolution in an attempt to avoid infringement, answers were filed on April 21, 1972 on behalf of Tru-Rol as follows:

"To change the contour helped the points fit better on the adapters."

Such an answer, under the circumstances, rather than indicating a good faith effort to avoid infringement of a valid patent, indicates instead a wilful attempt to deceive and an intent to circumvent by devious means the protection afforded to the plaintiff by the patent in suit.

Fourthly, the sole witness for the defendant, Mr. Hubacher, acting on orders of trial counsel of defendant, did not test or measure in any way any of the accused devices except for the ZC 001 tooth and the ZC 002 adapter. Even then, the only measurements Mr. Hubacher performed in the ZC 001 tooth were of the width of the flats of the rails in the socket.

For all of the aforegoing reasons taken together, the court is of the view that the defense of this case was undertaken recklessly and on plainly unmeritorious grounds. The circumstances of this case lend themselves to the conclusion that there was a deliberate and willful copying of the invention of the patent in suit

16. Pretrial order, Schedule "C," ¶ 2; see also PX84.

17. PX 92, p. 33.

by Tractortecnic. On the eve of trial the robot defendant attempted to have this suit dismissed as moot because, it was represented, Tractortecnic had already stopped making the "largest selling tooth" and had had a new, allegedly non-infringing tooth design available for manufacture for several years. In the meantime the plaintiff, in justifiably attempting to enforce its patent rights, has been required to expend considerable sums to combat at best cavalierly asserted defenses. To require plaintiff to bear the cost of its reasonable attorney fees would be unjust in these circumstances. Marvel Specialty Company v. Bell Hosiery Mills, Inc., 386 F.2d 287 (4th Cir. 1967), cert. denied, 390 U.S. 1030, 88 S.Ct. 1409, 20 L.Ed.2d 286 (1968); Tidewater Patent Development v. Kitchen, 371 F.2d 1004 (4th Cir. 1967), cert. denied, 389 U.S. 821, 88 S.Ct. 46, 19 L.Ed.2d 74 (1967).

■ The last issue to be decided here is the one raised by plaintiff's request that a finding be entered of such control by Tractortecnic of the defense in this case as to bind Tractortecnic by a judgment herein of validity and infringement. As previously noted, the defendant's president, Mr. Gurley, admitted that Tractortecnic was the real party in interest in this proceeding. In addition a settlement offer on behalf of the defense was made in this case and negotiations for settlement conducted at the instigation of Tractortecnic on the basis that Tractortecnic would cease production of the accused devices and substitute a new design with which Mr. Gurley was unfamiliar.[18]

■ In this Circuit it is well established that one who, although not a named party, undertakes management and control of one side of a patent case is bound by the outcome of the case, at least where such management and control was fully known to the litigating parties. Tidewater Patent Development Co. v. Kitchen, 421 F.2d 680, 681 (4th Cir. 1970); E. I. Du Pont de Nemours v. Sylvania Industrial Corporation, 122 F.2d 400 (4th Cir. 1941). In addition it appears appropriate for the court trying the initial patent case to enter its findings of fact that an entity not a named party to the suit actually controlled the litigation to the extent that the unnamed party should be bound by the decision on the merits. Redman v. Stedman Mfg. Co., 154 F.Supp. 378, 383 (M.D.N.C. 1957), aff'd, 257 F.2d 867 (4th Cir. 1958), cert. denied, 358 U.S. 928, 79 S. Ct. 314, 3 L.Ed.2d 302 (1959); Brock v. Brown, 138 F.Supp. 628, 636–639 (D. Md.1956), aff'd, 240 F.2d 723 (4th Cir. 1957); Keiser v. High Point Hardware Co., 199 F.Supp. 623, 627–628 (M.D.N. C.1961), rev'd on other grounds, 311 F. 2d 850 (4th Cir. 1962); Aghnides v. Meyer's Co., 117 F.Supp. 839, 840 (M. D.N.C.1954).

■ The persons for whose benefit, to the knowledge of the court and of all the parties to the record, litigation is being conducted, cannot, in the legal sense, be said to be strangers to the cause. This case is within the principle that one who prosecutes or defends a suit in the name of another, to establish and protect his own right, or who assists in the prosecution or defense of an action in aid of some interest of his own, and who does this openly, to the knowledge of the opposing party is as much bound by the judgment, and is fully entitled to avail himself of it, as an estoppel against an adversary party, as he would be if he had been a party of record. Souffront v. LaCompagnie des Sucreries, 217 U.S. 475, 487, 30 S.Ct. 608, 54 L.Ed. 846 (1909); Schnell v. Peter Eckrich & Sons, 365 U.S. 260, 262, 81 S.Ct. 557, 5 L.Ed.2d 546 (1961); E. I. Du Pont de Nemours v. Sylvania Industrial Corporation, *supra*; Baker-Cammack Hosiery Mills v. Davis Co., 181 F.2d 550, 573 (4th Cir. 1950), cert. denied, 340 U.S. 824, 71 S.Ct. 58, 95 L. Ed. 605 (1950).

This court concludes that Tractortecnic has had its day in court in reference

18. Tr. 505–506; 512–514.

to the issues of validity of the patent in suit and the infringement of the accused devices. Through its attorney, Mr. Spencer, Tractortecnic presented and cross-examined witnesses. It had a full opportunity to take advantage of every defense that could have been asserted had it been a named party to the suit. It controlled and directed all phases of the preparation and presentation of the defendant's case as to validity and infringement and undertook to pay all expenses of Tru-Rol incurred in connection with the present case as well as all damages assessed herein against Tru-Rol.[19] Under all of the circumstances here present a finding that Tractortecnic was in control of the defendant's side of this litigation meets the test of "traditional notions of fair play and substantial justice" established in a different context by International Shoe v. Washington, 326 U.S. 310, 320, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

For all of the above reasons, the court concludes that plaintiff is entitled to the following relief:

(1). An injunction under 35 U.S.C., Section 283 against the defendant, its officers, agents, servants, employees, and attorneys enjoining further infringement, directly or indirectly of claims 1, 3, 8, 15, 20, 21, and 28 thereof and for making, using or selling the tooth parts described respectively in this cause as ZC 001, ZC 002, ZC 216, ZC 302, ZC 361, ZC 362 and ZI 401 or equivalents thereof during the life of the aforesaid patent.

(2). An accounting for damages from defendant under 35 U.S.C. 284. If the parties within 60 days hereof are unable to agree upon damages (including treble damages, if any), they are to be assessed through further proceedings.

(3). An award of reasonable attorney fees in accordance with the provisions of 35 U.S.C. 285. If the parties

are unable to agree upon the amount thereof within 60 days of this date, further proceedings will be scheduled herein to assess the amount.

(4). Its statutory costs and disbursements herein to be fixed and determined by the Clerk of this Court after entry herein of final judgment.

This opinion shall constitute the court's findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P.

---

19. See PX92, Dep. Exhs. 5 and 7. The defendant's objection to the introduction of Gurley deposition documents, which were sought to be introduced by the plaintiff as relevant to the issue of control of this suit by Tractortecnic, is hereby overruled.